[Crim. No. 20707. June 9, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
MAURICE SETON THOMPSON, Defendant and Appellant.

304

**COUNSEL**

Quin Denvir, State Public Defender, under appointment by the Supreme Court, Charles M. Sevilla, Chief Assistant State Public Defender, Joseph Levine and Richard A. Curtis, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Steven H. Zeigen, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—This is an automatic appeal from a judgment imposing a penalty of death. (See Pen. Code, § 1239, subd. (b).)[1]

### I

Maurice Seton Thompson was convicted by a jury of the first degree murder of Michael Whalen (§§ 187, 189), the attempted first degree murder of June Filice (§§ 664, 187, 189), the robberies of June Filice and Michael Whalen (§ 211), and first degree burglary (§§ 459, 460). Two special circumstances were found to be true, i.e., that appellant personally committed a willful, deliberate, and premeditated murder during the commission and attempted commission of both a robbery and a burglary. (Former § 190.2, subds. (c)(3)(i) and (c)(3)(v).) The jury also concluded that appellant had personally used a firearm during the commission of each of the substantive offenses. (§ 12022.5.) The punishment for the murder was determined to be death.

On November 14, 1977, appellant entered a bar owned by June Filice in La Mirada. June had seen appellant in the bar before but spoke to him for the first time and learned he was called Tom.

Later that evening June was at home taking a bath when she heard a knock on the bathroom door. She opened the door and saw a man holding a gun on Michael Whalen, her fiance. The intruder told the two that he wanted their money. Whalen displayed an empty wallet but reached into his pocket and retrieved a wad of crumpled bills, which the man "just looked at" but did not take.

With the intruder's permission, June went into her bedroom and put on a robe. She pointed out her purse, which she said contained $5, cred-

---

[1]All references hereinafter to sections are to the Penal Code, except as otherwise indicated.

it cards, and a checkbook. The intruder said nothing and made no attempt to inspect the purse. June then offered the jewelry on her dressing table and indicated that one ring was worth $6,000. The intruder did not take the jewelry, but he motioned June and Whalen downstairs where he directed them to sit. The intruder asked Whalen for his car keys, and Whalen stated that it would be a mistake to take the car since the car was well known due to its personalized license plates. At the behest of the intruder, Whalen removed the car keys from his key ring.

At this point, June asked the intruder why he picked their particular house. When he answered that someone had told him it would be "a good hit," June told him he had been given a bad "steer." She explained that due to a recent fire, little remained in the house. Again, the intruder inquired about any money, whereupon June reminded him of the $5 in her purse, her jewelry and the cash in Whalen's pocket. However, the intruder said he did not want them.

After staring at Whalen and June for a few seconds, the intruder picked up a pillow from the floor and held it in front of his gun. Looking at June, he told her, "You know why I'm here and you know who sent me." Then he fired three shots into Whalen and three into June.

Whalen was fatally wounded. June was shot twice in the left leg and once in the stomach. She watched the man run out of the room and throw away the key ring from which the car keys had been removed. It was later determined that the car was never moved and the car keys were dropped in a park near the house.

After the intruder left, June dialed the operator for the police. When they arrived, she told them her estranged husband, Frank, had shot her. June believed Frank had arranged the shooting. She based this belief on the intruder's remark, "You know who sent me," and on the fact that Frank had previously threatened "to put a .38 slug between Mike's eyes" and to throw acid in her face. She explained that "if you belong to Frank, you're not going to belong to anybody else."

June's 21-year-old son, Frank, Jr., had also heard his father threaten his mother and Whalen. In addition, the son had heard his father ask for a picture of Whalen a week before the shootings. When told of his mother's description of the assailant, Frank, Jr., believed him to be a Larry V., a criminal friend of his father. However, at the hospital June identified her attacker as "Tom" and picked appellant's picture out of

two photographic lineups. She positively identified appellant at trial and was certain that she had not confused him with Larry V.

Almost two weeks later, in the early morning hours of November 27, 1977, appellant held up Scott Domnie, the supervisor of the Breakers Restaurant in San Luis Obispo.[2] Wearing a ski mask and pointing a gun, appellant accosted Domnie as he was leaving the restaurant and approaching his car in the parking lot. Appellant suggested they "go back into the restaurant and get the money." Domnie said he did not have the keys but would help appellant break in. Domnie then heard the click of the pistol's hammer being pulled back, and he quickly offered to give appellant what money he had. Appellant instructed Domnie to put his wallet on the floor of the car and to put the keys in the car's ignition. Appellant then drove the car out of the lot and down the hill. The police discovered the car the following day.

That same afternoon, appellant returned to the Los Angeles area and contacted Mark Amos, a man he had met a month earlier through Frank Filice. Frank had told appellant that Amos was a person who bought stolen cars. In fact, Amos was an undercover agent working for the Los Angeles County Sheriff's office. Appellant and his girlfriend, Cheryl Patton, met with Amos and discussed the sale of a 1977 Ford LTD (not Domnie's car) for $700. After arranging to meet the two at 11 p.m. in a Santa Monica bar, Amos called Los Angeles Deputy Sheriff Robert Roane and learned that appellant was wanted.

Roane joined in the 11 p.m. meeting, pretending to be a potential buyer of the car. He also coordinated appellant's arrest with the Santa Monica and La Habra Police Departments. The officers arrested appellant and his girlfriend, Patton, as they emerged from the bar after the meeting was concluded.

---

[2]Appellant was not charged with this robbery. Nevertheless, relying on subdivision (b) of Evidence Code section 1101, the trial court permitted the prosecution to introduce evidence of the crime to prove appellant's intent to steal from Whalen and June. (See *post*, section II.)

Evidence Code section 1101 provides in pertinent part: "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his conduct) is inadmissible when offered to prove his conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident) other than his disposition to commit such acts."

At the Santa Monica police station, Roane obtained permission to search appellant's motel room for two shotguns which appellant had offered to sell in the bar. Two searches of the room turned up the shotguns as well as a .357 magnum pistol, ammunition, disguise kits, ski masks, and the wallet and keys of Domnie. It was subsequently determined that the bullets recovered from June's loveseat and from Whalen's body came from the pistol seized in appellant's room.[3]

In response to this evidence, defense counsel argued that appellant was not the person who had committed the charged offenses. ██ ██ ██ Further, he contended that the evidence failed to establish beyond a reasonable doubt that the perpetrator, even if it were appellant, had the specific intent to steal.[4]

A specific intent to steal was a necessary element of the substantive crimes of robbery and burglary[5] as well as the special-circumstances allegations.[6] Since the prosecution sought to prove that appellant was guilty of first degree murder under a felony-murder theory premised on

---

[3]About 12 hours after his arrest, appellant gave a statement to Officer West about his involvement in the shootings of June and Whalen. The statement amounted to a confession. The prosecution did not seek to introduce this statement during its case in chief, but used it during the cross-examination of appellant and as rebuttal evidence. In his trial testimony, appellant admitted making the statement but denied it was true. He asserted the statement was given because of an "understanding" he had with West that if he confessed, Patton would be released from jail. (See *post*, section IV.)

[4]A specific intent to steal requires a specific intent to *permanently* deprive the owner of his or her property. (*People v. Brown* (1894) 105 Cal. 66, 69 [38 P. 518] [burglary]; *People v. Ford* (1964) 60 Cal.2d 772, 793 [36 Cal.Rptr. 620, 388 P.2d 892] [robbery]; 1 Witkin, Cal. Crimes, § 384, p. 358, § 441, p. 407, § 459, p. 421.) If an individual who enters a dwelling or takes property intends only to temporarily deprive the owner, there is no intent to steal and hence no burglary or robbery. (*People v. Brown, supra*, 105 Cal. at p. 69 [burglary]; *People v. Kunkin* (1973) 9 Cal.3d 245, 251-253 [107 Cal.Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199] [theft by larceny (robbery is a form of theft by larceny, see 1 Witkin, *op. cit. supra*, § 430, p. 398)].)

[5]The information alleged that the burglary was committed when appellant entered June's residence "with the intent to commit larceny." It is established that "the intent to commit larceny means the intent to deprive the owner of his property permanently;..." (1 Witkin, *op. cit. supra*, § 459, p. 421.) (An intent to commit larceny is thus synonymous with an intent to steal.)

The burglary count did not allege that appellant's entry was made with an intent to commit an assault or murder, presumably because such a burglary could not be used to invoke the felony-murder rule in connection with the homicide counts. (See *People v. Wilson* (1969) 1 Cal.3d 431 [82 Cal.Rptr. 494, 462 P.2d 22].)

[6]There was no special-circumstances allegation that the murder was carried out for "valuable consideration." (Former § 190.2, subd. (a).) The prosecutor conceded the evidence was insufficient to prove such an allegation beyond a reasonable doubt.

the underlying felonies of robbery and burglary,[7] a specific intent to steal was important in any resolution of the murder charge. If the jury accepted the appellant's contention that he lacked a specific intent to steal, he would have established a defense at least to the special-circumstances allegations and to the robbery and burglary counts.[8]

The jury found appellant guilty of all the offenses and found the special circumstances and firearm-use allegations to be true. Prior to the commencement of the penalty phase of the trial, appellant moved to have a new jury empanelled to determine if he should receive a sentence of death. Counsel believed that since he had portrayed the killer as a cold-blooded executioner at the guilt phase, it was impossible to argue to the same jury at the penalty phase that appellant's life should be spared. The trial court recognized that at the guilt phase counsel's argument to the jury "almost had to be made." Nevertheless, the motion was denied and a verdict of death was returned by the jury. This automatic appeal follows.

## II

▇ This court must determine whether the trial court erred when it permitted the prosecution to introduce evidence of the robbery that appellant committed outside the Breakers Restaurant in San Luis Obispo. This evidence was offered to prove that he had an intent to steal at the time the offenses were committed at June's house.

▇ The admission of any evidence that involves crimes other than those for which a defendant is being tried has a "highly inflammatory and prejudicial effect"[9] on the trier of fact. This court has repeatedly warned that the admissibility of this type of evidence must be "scrutinized with great care."[10] "[A] closely reasoned analysis"[11] of the pertinent factors must be undertaken before a determination can be made of its admissibility.

---

[7]The prosecution also sought to establish appellant's guilt of first degree murder on the separate theory that the murder was willful, deliberate, and premeditated. (§ 189.)

[8]The record indicates that no jury instructions on necessarily included offenses were given or requested by either party.

[9]See 2 Wigmore, Evidence (1979 pocket supp.) page 187.

[10]People v. Durham (1969) 70 Cal.2d 171, 186 [74 Cal.Rptr. 262, 449 P.2d 198]; see also, e.g., People v. Kelley (1967) 66 Cal.2d 232, 239 [57 Cal.Rptr. 363, 424 P.2d 947].

[11]See People v. Banks (1970) 2 Cal.3d 127, 137 [84 Cal.Rptr. 367, 465 P.2d 263].

Evidence of an uncharged offense is usually sought to be admitted as "evidence that, if found to be true, proves a fact from which an inference[12] of another fact may be drawn." (See CALJIC No. 2.00 (1979 Revision) (4th ed. 1979).) ■ As with other types of circumstantial evidence, its admissibility depends upon three principal factors: (1) the *materiality* of the fact sought to be proved or disproved; (2) the *tendency* of the uncharged crime to prove or disprove the material fact; and (3) the existence of any *rule* or *policy* requiring the exclusion of relevant evidence. (See, Comment, *A Proposed Analytical Method for the Determination of the Admissibility of Evidence of Other Crimes in California* (1960) 7 UCLA L.Rev. 463, 465-468; see also Witkin, Cal. Evidence (2d ed. 1966) §§ 301-302, 305.)

■ In order to satisfy the requirement of *materiality*, the fact sought to be proved may be either an ultimate fact in the proceeding[13] or an intermediate fact "from which such ultimate fact[] may be presumed or inferred."[14] (See Law Revision Com. comment to Evid. Code, § 210.) Further, the ultimate fact to be proved must be "actually in dispute." (See Law Revision Com. comment to Evid. Code, § 210.) If an accused has not "actually placed that [ultimate fact] in issue," evidence of uncharged offenses may not be admitted to prove it. (*People* v. *Thomas* (1978) 20 Cal.3d 457, 467 [143 Cal.Rptr. 215, 573 P.2d 433]; see also *People* v. *Antick* (1975) 15 Cal.3d 79, 93 [123 Cal.Rptr. 475, 539 P.2d 43]; Jefferson, Cal. Evidence Benchbook (1972) § 21.3, p. 264.) The fact that an accused has pleaded not guilty is not sufficient to place the elements of the crimes charged against him "in issue." (*People* v. *Schader* (1969) 71 Cal.2d 761, 775-776, fn. 13 [80 Cal.Rptr. 1, 457 P.2d 841].)

---

[12]"An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts found or otherwise established in the action." (Evid. Code, § 600, subd. (b).)

[13]Both the identity of the perpetrator and the elements of the charged crimes are ultimate facts in a criminal case, as are the elements of certain defenses. The admission of the uncharged Breakers robbery was used to establish appellant's specific intent to steal at the time of the shootings of Whalen and June. As an element of the crimes charged against appellant (see *ante*, fns. 4-8 and accompanying text), intent to steal was an ultimate fact in his trial.

[14]Motive, opportunity, plan, scheme, design, and modus operandi are examples of intermediate facts. Evidence of an uncharged offense offered to prove an intermediate fact is not necessarily material. The materiality requirement is satisfied *only* if the intermediate fact tends logically and reasonably to prove an ultimate fact which is in dispute. (Cf., *post*, fn. 18.)

In ascertaining whether evidence of other crimes has a *tendency* to prove the material fact, the court must first determine whether or not the uncharged offense serves "'logically, naturally, and by reasonable inference'" to establish that fact.[15] (See *People v. Schader, supra*, 71 Cal.2d at p. 775; Evid. Code, §§ 210, 600, subd. (b).) The court "must look behind the label describing the kind of similarity or relation between the [uncharged] offense and the charged offense; it must examine the precise elements of similarity between the offenses with respect to the issue for which the evidence is proffered and satisfy itself that each link of the chain of inference between the former and the latter is reasonably strong."[16] (*People v. Schader, supra*, 71 Cal.2d at p. 775, fn. omitted.) If the connection between the uncharged offense and the ultimate fact in dispute is not clear, the evidence should be excluded. (*People v. Durham, supra*, 70 Cal.2d at pp. 186-187; see also *People v. Sam* (1969) 71 Cal.2d 194, 203 [77 Cal.Rptr. 804, 454 P.2d 700].)

Three interrelated extrinsic *policies* tend to limit the admissibility of evidence of other crimes despite the fact that the evidence may be relevant to prove a material fact. ■ Evidence Code section 1101, subdivision (a) expressly prohibits the use of an uncharged offense if the only theory of relevance is that the accused has a propensity (or disposition) to commit the crime charged and that this propensity is circumstantial proof that the accused behaved accordingly on the occasion of the charged offense. (See *People v. Beamon* (1973) 8 Cal.3d 625, 632-633 [105 Cal.Rptr. 681, 504 P.2d 905]; *People v. Kelley, supra*, 66 Cal.2d at p. 238; see also Jefferson, *op. cit. supra*, § 21.3, p. 262.)

---

[15]When evidence tends to prove a material fact, it is said to be relevant evidence. (Evid. Code, § 210.)

[16]Wigmore has made the following pertinent observation about the relevance of evidence of uncharged offenses when offered to prove the doing of an act: "At the outset of this entire class of inferences, it must be noted that, where the doing of an act is the ultimate [fact to be proved], there can never be a direct inference from an act of *former conduct* to the *act charged*; there must always be a double step of inference of some sort. *I.e.* it cannot be argued: 'Because A did an act X last year, therefore he probably did the act X as now charged.' Human action being infinitely varied, there is no adequate probative connection between the two. . . . [¶] Thus, whenever resort is had to a person's past conduct or acts, it always implies *intermediately another inference* . . . . The impulse to argue from A's former conduct directly to his doing or not doing of the deed charged is perhaps a natural one. But it will always be found, upon analysis of the process of reasoning, that there is involved in it a hidden intermediary step of some sort, resting on a second inference of character, motive, plan, or the like. [¶] This intermediate step is always implicit, and must be brought out." (Wigmore, The Science of Judicial Proof (3d ed. 1937) pp. 102-103; original italics.)

Subdivision (a) does not permit a court to balance the probative value of the evidence against its prejudicial effect. The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact. If no theory of relevancy can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible.[17]

The primary reasoning that underlies this basic rule of exclusion is not the unreasonable nature of the forbidden chain of reasoning. (See *People* v. *Schader, supra*, 71 Cal.2d at p. 772.) Rather, it is the insubstantial nature of the inference as compared to the "grave danger of prejudice" to an accused when evidence of an uncharged offense is given to a jury. (See Jefferson, *op. cit. supra*, § 21.3, p. 262; *People* v. *Sam, supra*, 71 Cal.2d at p. 203.) As Wigmore notes, admission of this evidence produces an "over-strong tendency to believe the defendant guilty of the charge merely because he is a likely person to do such acts." (1 Wigmore, Evidence, § 194, p. 650.) It breeds a "tendency to condemn, not because he is believed guilty of the present charge, but because he has escaped unpunished from other offences...." (*Ibid.*) Moreover, "the jury might be unable to identify with a defendant of offensive character, and hence tend to disbelieve the evidence in his favor."[18] (Note (1964) 78 Harv.L.Rev. 426, 436.) "We have thus reached the conclusion that the risk of convicting the innocent...is sufficiently imminent for us to forego the slight marginal gain in punishing the guilty."[19] (*People* v. *Schader, supra*, 71 Cal.2d at pp. 772-773.)

---

[17]Since subdivision (a) of section 1101 forbids the admission of evidence of uncharged offenses under any theory of relevancy which relies upon the intermediate fact of character or disposition, it might be possible to infer that this policy of exclusion also precludes the admission of such evidence under a theory that relies on other intermediate facts, such as modus operandi or motive. Subdivison (b) makes clear that this inference was not intended by the Law Revision Commission or the Legislature. (See *ante*, fn. 2; see also Cal. Law Revision Com. comment to Evid. Code, § 1101.)

However, evidence of other crimes is not automatically admissible under subdivision (b) whenever it is offered to prove an intermediate fact other than disposition. Subdivision (b) merely clarifies the fact that subdivision (a) "does not prohibit" the admission of such evidence when it is offered to prove a fact other than disposition. (Cal. Law Revision Com. comment to Evid. Code, § 1101.) The evidence of other crimes must still satisfy the rules of admissibility codified in sections 210, 350 and 352. (Cf., *ante*, fn. 14.)

[18]Other purposes are served by this rule of exclusion. It promotes judicial efficiency by restricting proof of extraneous crimes (*People* v. *Thomas, supra*, 20 Cal.3d at p. 464); prevents confusion of the issues (*People* v. *Schader, supra*, 71 Cal.2d at pp. 772-773, fn. 6); and avoids the problem of giving an ex-felon a criminal record that follows him everywhere (*id.*, at pp. 773, fn. 7).

[19]Wigmore has noted "the fallacy of supposing, as some do, that the object of the rule is merely to show mercy to the guilty one, to give him a final chance for life and

Even if evidence of other crimes is relevant under a theory of admissibility that does not rely on proving disposition, it can be highly prejudicial. "Regardless of its probative value, evidence of other crimes always involves the risk of serious prejudice. . . ." (*People v. Griffin* (1967) 66 Cal.2d 459, 466 [58 Cal.Rptr. 107, 426 P.2d 507].) Therefore, the law places other restrictions on its admissibility. If evidence is "merely cumulative with respect to other evidence which the People may use to prove the same issue," it is excluded under a rule of necessity. (*People v. Schader, supra*, 71 Cal.2d at pp. 774, 775, fn. omitted; see also *People v. Guerrero* (1976) 16 Cal.3d 719, 725, 727 [129 Cal. Rptr. 166, 548 P.2d 366].) Further, under Evidence Code section 352, the probative value of this evidence[20] must outweigh its prejudicial effect. (See *People v. Guerrero, supra*, 16 Cal.3d at p. 727; *People v. Schader, supra*, 71 Cal.2d at pp. 772, fn. 4, and 774.) Since "substantial prejudicial effect [is] inherent in [such] evidence,"[21] uncharged offenses are admissible only if they have *substantial* probative value. If there is any doubt, the evidence should be excluded. (See *People v. Kelley, supra*, 66 Cal.2d at p. 239.)

In the present case the prosecution sought to justify the admission of the uncharged robbery at the Breakers Restaurant on the basis that it proved appellant's specific intent to steal at the time of the shootings in La Habra. Specific intent to steal was an element of the crimes charged and of the allegations of special circumstances. Thus, it was an ultimate fact in the action. (Cf., *ante*, fns. 4-8 and accompanying text.) As shown by defense counsel's arguments to the jury, appellant placed this element in issue, and the evidence of the Breakers robbery was not cumulative. The requirements of materiality and necessity were met.

---

liberty by artificially handicapping the prosecution,—thus importing into the courts of justice the notions of sportsmanship. On the contrary, the object is to prevent a person not guilty of the present charge from being improperly found guilty of it." (1 Wigmore, Evidence, *supra*, § 194, p. 651 (italics omitted); cf. *People v. Fries* (1979) 24 Cal.3d 222, 231-232 [155 Cal.Rptr. 194, 594 P.2d 19].)

[20]Probative value goes to the *weight* of the evidence of other offenses. The evidence is probative if it is material, relevant, and necessary. "[H]ow much 'probative value' proffered evidence has depends upon the extent to which it tends to prove an issue by logic and reasonable inference (degree of relevancy), the importance of the issue to the case (degree of materiality), and the necessity of proving the issue by means of *this* particular piece of evidence (degree of necessity)." (*People v. Delgado* (1973) 32 Cal.App.3d 242, 249 [108 Cal.Rptr. 399]; overruled on another point in *People v. Rist* (1976) 16 Cal.3d 211, 221 [127 Cal.Rptr. 457, 545 P.2d 833].)

[21]*People v. Sam, supra*, 71 Cal.2d at page 206.

However, "admission of other crimes evidence cannot be justified merely by asserting an admissible purpose." (*People* v. *Guerrero, supra*, 16 Cal.3d at p. 724.) The question remains as to "whether the particular evidence of defendant's other offenses *here* offered is logically relevant to prove the defendant's intent *in this case.*" (Comment, *op. cit. supra*, 7 UCLA L.Rev. at p. 464, fn. omitted, original italics.)[22]

The theories of relevance advanced in this case are premised on the contention that if a person acts similarly in similar situations, he probably harbors the same intent in each instance. Therefore, if the circumstances of the Breakers Restaurant robbery showed that appellant had an intent to steal, then the presence of similar circumstances in La Habra would suggest that he had the same intent at the time of the shootings.[23]

---

[22]Courts have been frequently faulted for "fail[ing] to engage in the analysis of the evidence necessary for a determination of relevancy. Rather, the admissibility of evidence of other offenses is determined by a seemingly mechanical application of such precedent. For example, in the case of most crimes, the defendant's criminal intent is a fact necessary to be proved. The people offer evidence of defendant's prior crimes to prove his intent. The courts seem to reason that evidence of defendant's other offenses is deemed by precedent to be admissible to show intent; here the people offer such evidence to show intent; therefore, the evidence is admissible. In this analysis, the courts appear to omit the most essential step in the proper determination of the admissibility of the evidence offered. They fail to determine whether the particular evidence of defendant's other offenses *here* offered is logically relevant to prove the defendant's intent *in this case.*" (*Ibid.*, fns. omitted, original italics.)

[23]It has been assumed on occasion that a showing of substantial similarity is not required if intent is the material fact sought to be proved by the introduction of the evidence of an uncharged offense. This assumption is too broad. It is correct only when the similarity of offenses is irrelevant to the chain of inference sought to be drawn between the uncharged offense and the fact of intent in the charged offense.

*People* v. *Durham, supra*, 70 Cal.2d 171, was such a case. The defendant was accused of killing a police officer who had made a traffic stop on the car defendant was driving. This court ruled that several prior dissimilar crimes were admissible to prove intent to kill, premeditation, and deliberation by establishing the intermediate fact of motive. Similarity of offenses was not necessary to establish this theory of relevance, since it was the *fact* of the commission of the uncharged crimes—not their similarity to the charged offense—which gave rise to the reasonable inference that defendant had a motive to kill the officer.

However, similarity is often necessary to bridge the gap between other crimes evidence and the material fact sought to be proved. Thus, in *People* v. *Guerrero, supra*, 16 Cal.3d 719, a defendant was accused of the murder of a 17-year-old girl by means of a blunt object. The victim had been found with her blouse pulled up but there was no evidence of sexual molestation. The prosecution was allowed at trial to introduce evidence that defendant had recently raped another 17-year-old girl and had thereafter threatened her with a lug wrench. This evidence was admitted to establish, inter alia, that in the charged offense defendant had intended to rape the victim, thus invoking the felony-murder rule.

This court unanimously ruled the evidence was inadmissible to prove intent since the

The prosecution concedes that overall similarity between the charged and the uncharged offenses was insufficient to justify an inference that an intent to steal *money* was common to both. Nevertheless, it is urged that an inference of a common intent to steal car keys or automobiles may arise from a more limited "similarity," i.e., "appellant's reaction when an intended victim indicates an inability to comply with his request" for money.

This claimed similarity is not borne out by the facts. The testimony at trial did *not* establish that June or Whalen indicated an "inability" to comply with appellant's demands. Whalen offered appellant cash of an undetermined amount. June offered her purse, her credit cards, and her jewelry, including a ring worth $6,000. Further, there was no evidence that in La Habra appellant expressed an interest in a larger sum of money that might have come from his victim's business, as he had at the Breakers robbery.

The evidence did *not* show that appellant "reacted" in a similar fashion. After failing to obtain money from inside the Breakers Restaurant, appellant settled for the money he thought was in his victim's wallet. Contrast these facts with the events that took place in La Habra where the victims' wallet, purse, and money were all refused. Further, the victims were shot.

The only similarities were that in both instances the actor demanded an automobile and left the scene with a set of his victim's car keys. With respect to the former "similarity," it is urged that the evidence that appellant drove off with Domnie's car tends to establish that appellant would have driven off with June's car but for Whalen's warning about its recognizability. Thus, the argument runs, the evidence of this aspect of the Breakers robbery tends to prove appellant's intent to steal June's car at the time he demanded it. However, this chain of reasoning does not tend to prove that appellant had an intent to *permanently* deprive June of her car, since the facts of the Breakers robbery do not reasonably show appellant had an intent to *permanently* deprive Dom-

prosecution had "not shown that the similarities between the two offenses are substantial enough to have probative value." (16 Cal.3d at p. 728.) Significantly, the court relied upon the rationale of *People v. Haston* (1968) 69 Cal.2d 233. *Haston* is the leading case for the well established rule that there must be distinctive common marks between an uncharged and charged crime to prove *identity* on the basis of a common modus operandi.

nie of his car. When he confessed the Breakers robbery to Officer West, appellant said he "used [Domnie's] car to get back down the hill and . . . parked it." Domnie himself confirmed that the car was recovered by local police shortly after it was taken. There was no evidence it had been hidden or rendered inoperable by appellant. To the extent that it showed any intent with respect to June's car, the evidence of the Breakers robbery showed only an intent to temporarily deprive. This intent does not tend to establish the intent necessary for a burglary or robbery. (Cf., *ante*, fn. 4.)

The other similarity established by the record is that on both occasions appellant demanded and took a set of car keys. However, this single act would not invest the evidence of the Breakers robbery with probative value substantial enough to outweigh its prejudicial effect. The probative force of this similarity is significantly weakened by the dissimilarities discussed earlier. Moreover, there is great prejudice in admitting evidence of the entire Breakers Restaurant robbery to establish a limited similarity[24] on the narrow question of appellant's intent to steal a set of car keys.

Evidence that an individual intended to steal car keys on one occasion does not, by itself, substantially tend to prove that he intended to steal them on a second occasion. The only tendency it establishes is the impermissible inference that he has a "disposition to commit" such crimes. Since the Evidence Code specifically forbids the admission of uncharged offenses to prove such a disposition, even as a waystation to proving intent, the trial court erred in admitting this evidence.

## III

This court's recent decision in *People* v. *Green* (1980) *ante*, page 1 [164 Cal.Rptr. 1, 609 P.2d 468] raises the additional question of whether the evidence in the present case was sufficient to support the jury's findings that the robbery and burglary special circumstances were true. In *Green*, as here, the defendant was convicted of first degree murder with a special circumstances finding that the murder was (inter

---

[24]When similarity of behavior is critical to the chain of relevance, it would normally seem appropriate to compare the overall circumstances of each incident, not merely a truncated portion thereof. Nevertheless, in view of the fact that even the limited similarities asserted in this case do not support the admission of the evidence of the Breakers robbery, this question need not be addressed here.

alia) "committed during the commission or attempted commission" of a robbery. (Former § 190.2, subd. (c)(3)(i).) This court's examination of the record in *Green* revealed that all the elements of robbery and first degree murder were established and that the robbery began before the shooting of the victim and ended after the shooting. Nevertheless, it was held, these facts were insufficient by themselves to meet the statutory requirements for a robbery special circumstances. (*ante*, at pp. 47-62.)

Under the special circumstances statute, this court reasoned in *Green*, "it was not enough for the jury to find the defendant guilty of a murder *and* one of the listed crimes [there, robbery]; the statute also required that the jury find the defendant committed the murder 'during the commission or attempted commission of' that crime. [Citation.] In other words, a valid conviction of a listed crime was a necessary condition to finding a corresponding special circumstance, but it was not a sufficient condition: the murder must also have been committed 'during the commission' of the underlying crime." (*Id.*, at p. 59.)

Since "the Legislature must have intended that each special circumstance provide a rational basis for distinguishing between those murderers who deserve to be considered for the death penalty and those who do not," the determination as to whether or not a murder was committed *during* the commission of robbery or other specified felony is not "a matter of semantics or simple chronology." (*Id.*, at pp. 60, 61, fn. omitted.) Rather, this determination involves proof of the intent of the accused. A murder is not committed *during* a robbery within the meaning of the statute unless the accused has "killed in cold blood *in order to advance an independent felonious purpose*, e.g., [has] carried out an execution-style slaying of the victim of or witness to a holdup, a kidnaping, or a rape." (*Id.*, at p. 61, italics added.) A special circumstance allegation of murder committed during a robbery has not been established where the accused's primary criminal goal "is not to steal but to kill and the robbery is merely incidental to the murder...because its sole object is to facilitate or conceal the primary crime." (*Id.*, at p. 61.)

■ The principles enunciated in *People* v. *Green* compel this court to examine the evidence in the present case to determine whether it is sufficient to uphold the jury's findings that the robbery and burglary special circumstances were true beyond a reasonable doubt. In making this determination, "the court must review *the whole record* in the light

most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738], italics added.)[25]

 While the ultimate issue under *Green* is whether or not the perpetrator's intent to steal was "merely incidental" to his intent to kill, it is at most a close question whether the perpetrator had any intent to steal at all. Although he vocalized a demand for money, the perpetrator declined all cash tendered by June and Whalen, including a wad of bills from Whalen's pocket which "could have been a hundred dollars," according to June's testimony. When June pointed out her purse and stated it contained $5, credit cards, and a checkbook, the perpetrator "didn't ask me to dump it out or open it or nothing." Then, June noticed her jewelry and rings on a nearby table. She told the man to take them and indicated that one ring alone was worth $6,000, but "he said he didn't want it." He never indicated he felt the items offered to him were too insubstantial in value; he never searched the house or any of its contents for more money; and he left the home with nothing valuable. The conclusion seems inescapable, then, that the evidence is insufficient to establish an intent to steal money.[26]

Therefore, if any inference of an intent to steal property may be drawn from the evidence adduced below, it could reasonably arise only from the perpetrator's demands for June's automobile and car keys. These demands were not mentioned until the end of the confrontation, after June and Whalen had been forced downstairs into the family room and June ordered to sit in a broken loveseat. Once the perpetrator obtained the car keys, the shootings followed.

---

[25]These rules for appellate review of the sufficiency of the evidence are as applicable in this state to challenges aimed at special circumstances findings (*People v. Green, supra, ante,* at p. 55) as they are to claims of alleged deficiencies in proof of identity, intent, or any other element of the prosecution's case. (See generally *Jackson v. Virginia* (1979) 443 U.S. 307 [61 L.Ed.2d 560, 99 S.Ct. 2781, 2789]; *People v. Bassett* (1968) 69 Cal.2d 122, 139-140 [70 Cal.Rptr. 193, 443 P.2d 777].)

[26]The most tenable inference that can be drawn from the whole record is that the demands for money were used as a pretext for some other objective. Since all parties agree that the perpetrator had at least a coequal—if not preeminent—intent to kill from the beginning of this episode, it would seem that the demands for money were simply a ruse to obtain the victims' cooperation until they could be maneuvered into a vulnerable position so that the shootings could be easily carried out.

The question presented under *People* v. *Green* is whether the shootings were done to advance an independent felonious purpose of stealing the car and keys or whether instead such intended thefts[27] were "merely incidental to the murder." Viewing the record as a whole in the light most favorable to the jury's verdicts, as this court must, it is impossible to conclude that the prosecution sustained its burden of proof on this issue.

The perpetrator's final remark to his victims as he held the pillow in front of his gun—"you know why I'm here and you know who sent me"—undeniably indicates that this confrontation was intended primarily (if not exclusively) to be a killing. The man's refusal without apparent reason to accept any of the victims' jewelry strongly imports that property gain was at most of secondary importance. According to an uncontradicted portion of his confession, appellant arrived at the home on foot. Therefore, he had a motive to take a car simply to effect his getaway from the shootings he intended; and the fact that his first demand for the car was made just prior to the shootings suggests that this was indeed his reason for demanding the car keys. It was well established by the record that appellant was an accomplished automobile thief, one who would have no need for car keys in order to make off with a vehicle.

When the whole record is viewed in a light most favorable to the verdict, it establishes at most a suspicion that appellant had an intent to steal independent of his intent to kill. However, "[e]vidence which merely raises a strong suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises a possibility, and this is not a sufficient basis for an inference of fact." (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].) "To justify a criminal conviction, the trier of fact must be reasonably persuaded to a near certainty. The trier must therefore have reasonably rejected all that undermines confidence." (*People* v. *Hall* (1964) 62 Cal.2d 104, 112 [41 Cal.Rptr. 284, 396 P.2d 700].) The evidence against appellant on the question of the truth of the special circumstances is "so fraught with uncertainty as to preclude a confident

---

[27]The automobile itself was in fact not moved by the perpetrator. While the car keys were taken from the home and never recovered, it would appear that appellant disposed of them, since unlike the murder weapon, the car keys were not found in appellant's motel room at the time of his arrest. (In his confession, appellant stated he discarded the keys in a park shortly after leaving June's home.)

determination of guilt beyond a reasonable doubt." (See *People v. Reyes* (1974) 12 Cal.3d 486, 500 [116 Cal.Rptr. 217, 526 P.2d 225].) It is insufficient to establish that the crime appellant committed was "in fact a murder in the commission of a robbery [rather than] the exact opposite, a robbery in the commission of a murder."[28] (*People v. Green, supra, ante,* at p. 60.)

The crimes depicted by the evidence below were brutal offenses carried out by an apparently cold and ruthless individual. The jurors who tried this case undoubtedly were sorely tested when they realized they would have to return a "not true" finding as to all special circumstances allegations if they determined appellant was primarily a killer instead of a thief. But constitutional protections, including the requirement of proof beyond a reasonable doubt, are not limited to those defendants who are morally blameless. (See *Jackson v. Virginia, supra,* 443 U.S. at pp. 324-325 [61 L.Ed.2d at pp. 576-577, 99 S.Ct. at p. 2792].) No matter how blameworthy in other respects, this appellant is entitled to the same dispassionate review of the sufficiency of the evidence as to the special circumstances findings as a civil litigant is allowed upon appeal from an adverse judgment for money. Indeed, in a case such as this, where the moral equities weigh so heavily against an individual, an appellate court has a special duty to apply its objectivity.

The jury's findings with respect to the special circumstances allegations may not stand.

## IV

Next, appellant raises several contentions relating to the confession he made to Officer West, which he repudiated at trial. According to appellant, the confession was not only involuntary but obtained during a period of illegal detention. (Pen. Code, § 825.) The additional argument is advanced that the prosecution improperly used the confession during appellant's cross-examination.

---

[28]It follows that the evidence is no more sufficient to sustain the special circumstance of burglary than of robbery. The insufficiency of the evidence in this case pertains to the incidental nature of appellant's intent to steal. Both the robbery and burglary special circumstances allegations involve an intent to steal, and the same evidence—or lack thereof—pertains to each. It follows therefore that the intent to steal is no less incidental with respect to the burglary special circumstance than with respect to the robbery special circumstance.

On Sunday, November 27th, appellant was arrested in Santa Monica with his girlfriend Cheryl Patton at 11:40 p.m. He arrived at the Santa Monica police station around midnight and was placed in a booking cell. Detective West of the La Habra Police Department sought to interrogate appellant at 1:07 a.m. Appellant declined to waive his *Miranda* rights and was returned to his cell. Soon thereafter, Deputy Roane of the Los Angeles County Sheriff's Department transported appellant to the La Habra police station. They arrived at approximately 3:15 a.m., and appellant was booked and placed in a cell by Officer West.

Detective West left the station at 4:30 a.m. but returned later that morning because he had "overlooked taking fingertip prints [of appellant and Cheryl] at the time of the booking." As West completed this procedure appellant inquired as to whether or not charges were to be filed against Patton. West replied that that decision rested with the authorities in Los Angeles County[29] with respect to any charges involving the sawed-off shotgun and the stolen car.

A discussion ensued concerning the possibility that Patton might be an accessory to murder. Appellant stated that she was innocent of any wrongdoing. West replied, "we had no way of knowing that,...both of them had chose[n] to remain silent, and we had no way to check it out at that time." Appellant replied, "If I could just see Cheryl, I could straighten out a lot of things." West arranged for Patton and appellant to converse over the telephone in the visitor's room of the police station. Their conversation lasted approximately 30 minutes.

When the visit concluded, West started to put appellant in his cell when appellant volunteered he desired to talk to West. "He [Thompson] said that he wanted to clear something up and get Cheryl out of trouble." West stated to appellant that "I [West] couldn't ask him any questions because he had already told me that he didn't wish to talk. I advised him that it would have to be him that requested to talk to me." Appellant replied, "when can I talk to you?" West indicated they "could talk anytime, if that's what he chose to do, and he indicated he did want to." Appellant was taken to West's office, advised of his *Miranda* rights, which were waived, and a confession was given. Appellant exonerated Patton.

---

[29]La Habra is in Orange County.

At 8 o'clock the next day, West again questioned appellant concerning other crimes appellant had mentioned on Monday. This interview was completed at 8:24 a.m., after which appellant was driven to court for arraignment. On the way, West detoured and drove along the route appellant indicated he had followed after the shootings. Appellant pointed out where, he said, he had discarded his shirt and hat.

At the motion to suppress this confession, appellant denied the confession he had made was true. He indicated he had confessed because he was concerned about Patton's health and the possibility that charges would be filed against her. There was an "agreement" between himself and Officer West that if he confessed, Patton would be released. Appellant testified that during his 3 a.m. booking at the La Habra police station, Officers West and Smyth spent about an hour "questioning me about the shooting and supplying some information about it, wanting to know if this happened or that happened and . . . just asking general questions about it for a while." Appellant testified he was told that if he did not "make a statement," the officers would "do their best to prosecute" Patton, which he took as an "ultimatum."

West testified that appellant asked "numerous times" about Patton's well-being throughout his detention. West tried to reassure appellant that she was being well treated, but denied he ever told appellant that charges would be filed against Patton if he did not talk. Appellant contends that the statement by Officer West that the police "had no way to check . . . out" Patton's innocence because "both of them had chose[n] to remain silent" renders the confession involuntary.[30]

■ The prosecution bears the burden at trial and on appeal to show that a confession was voluntary. (*People* v. *Jimenez* (1978) 21 Cal.3d 595, 602 [147 Cal.Rptr. 172, 580 P.2d 672].) ■ If a confession is admitted at trial, the appellate court is required to examine the uncontradicted facts "to determine independently whether the trial court's conclusion of voluntariness was properly found." (*People* v. *Berve* (1958) 51 Cal.2d 286, 290 [332 P.2d 97].) ■ A confession is voluntary if the accused's decision to speak is entirely "self-motivated" (*People* v. *Steger* (1976) 16 Cal.3d 539, 550 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]), i.e., if he freely and voluntarily

---

[30]Appellant makes no claim there was a violation of the principles of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974] or its California progeny.

chooses to speak without "any form of compulsion or promise of reward. . . ." (*People* v. *Trout* (1960) 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) In deciding whether a statement is voluntary, "it is immaterial whether the pressure or inducement was physical or mental and whether it was express or implied." (*Ibid.*) If the pressure or inducement was "a motivating cause" of the decision to confess, the confession is involuntary and inadmissible as a matter of law. (*People* v. *Brommel* (1961) 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].)

■ Appellant argues that West's statement amounted to an implied inducement that Patton would be released if appellant made a statement.[31] However, West was explicit that he would offer no assistance to Patton on the possible shotgun and stolen car offenses. Moreover, he repeatedly attempted to calm appellant's concern for Patton's health. In this context, West's statement could not have been interpreted to imply that a benefit would be given if appellant confessed. While appellant undoubtedly *hoped* Patton would be released if he confessed, his decision to talk to achieve that goal was self-motivated. It was not a product of any implied *inducement* by West.

Next, appellant contends that his confession was inadmissible because it was obtained while he was being illegally detained. (Pen. Code, § 825.) Appellant was arrested late on a Sunday night and was not arraigned until Tuesday morning. Although the booking process was essentially completed by 4:30 a.m., appellant was not transported to the local municipal court until the following day. The North Orange County Municipal Court was located four miles from the La Habra police station. Detective West testified this was approximately 10 minutes from the police station. In that court, arraignments were conducted once a day at 9 a.m. with the police normally leaving the police station "around 8:00 o'clock for a morning arraignment."

Officer West stated that "the time element" was the reason for the delay in arraigning appellant. "[D]ue to the time the defendant was booked in [4:30 a.m.], [and] the fact that neither of us had had any sleep, I decided to not even try to make that morning arraignment."

---

[31]It appears that appellant wanted Patton released from jail and no charges filed against her. There is no constitutionally significant distinction between these two concerns. If West had made such express or implied promises or threats, the resulting confession would undoubtedly have been involuntary.

California constitutional and statutory law requires prompt arraignment of individuals arrested for crimes. Article I, section 14 of the Constitution mandates that persons accused by felony complaint "be taken without unnecessary delay before a magistrate" in the county where the felony is triable. Penal Code section 825 requires that "[t]he defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays...."

The critical factor is the necessity for any delay in arraignment. ▌ These provisions do not authorize a two-day detention in all cases. Instead, "a limit [is placed] upon what may be considered a necessary delay, and a detention of less than two days, if unreasonable under the circumstances, is in violation of the statute" and of the Constitution. (See *Dragna* v. *White* (1955) 45 Cal.2d 469, 473 [289 P.2d 428]; *People* v. *Stroble* (1951) 36 Cal.2d 615, 624-626 [226 P.2d 330].) In determining which delays are necessary under the statute, this court has rejected arguments that the delay was "not unusual" or made "the work of the police and the district attorney easier." (*Id.*, at p. 625.) As the Court of Appeal recently observed, "[t]here is no authority to delay for the purpose of investigating the case. Subject to obvious health considerations the only permissible delay between the time of arrest and bringing the accused before a magistrate is the time necessary: to complete the arrest; to book the accused; to transport the accused to court; for the district attorney to evaluate the evidence for the limited purpose of determining what charge, if any, is to be filed; and to complete the necessary clerical and administrative tasks to prepare a formal pleading. [Citations.]" (*People* v. *Williams* (1977) 68 Cal.App.3d 36, 43, fn. omitted [137 Cal.Rptr. 70].)

▌ The right to a prompt arraignment is "'a fundamental right of the arrested person'" (*People* v. *Powell* (1967) 67 Cal.2d 32, 59 [59 Cal.Rptr. 817, 429 P.2d 137]), and cannot be ignored because an officer desires some sleep. ▌ However, even if a confession occurs during a period of illegal detention under section 825, that fact does not render it inadmissible. A delay in arraignment is treated "as only one of the factors to be considered in determining whether the statement was voluntarily made." (*Rogers* v. *Superior Court* (1955) 46 Cal.2d 3, 10 [291 P.2d 929]; *People* v. *Kendrick* (1961) 56 Cal.2d 71, 83-84 [14 Cal.Rptr. 13, 363 P.2d 13]; see also *People* v. *Haydel* (1974) 12 Cal.3d 190, 199 [115 Cal.Rptr. 394, 524 P.2d 866].) To exclude the statement, the defendant must .show that "the illegal detention produced the ad-

missions" or that there was an "essential connection between the illegal detention and the confession." (*Rogers* v. *Superior Court, supra*, 46 Cal.2d at pp. 10, 11; see *People* v. *Williams, supra*, 68 Cal.App.3d at p. 45.)

Officer West's testimony established that the purpose of the delay was not to obtain statements from appellant. It is true that appellant refused initially to discuss the case with West but he subsequently changed his mind and initiated further conversations. The decision to confess was itself free and voluntary. Under these circumstances, even if section 825 were violated, that would not render his confession inadmissible.

A final argument concerning the confession is advanced by appellant. He claims that the prosecution's use of the confession for the first time on cross-examination was improper. This court has criticized the tactic of waiting for cross-examination or rebuttal to use important evidence. ■ If evidence is directly probative of the crimes charged and can be introduced at the time of the case in chief, it should be. (See, e.g., *People* v. *Mosher* (1969) 1 Cal.3d 379, 399 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Carter* (1957) 48 Cal.2d 737, 753-754 [312 P.2d 665].)

The purpose of this restriction "is to assure an orderly presentation of evidence so that the trier of fact will not be confused; to prevent a party from unduly magnifying certain evidence by dramatically introducing it late in the trial; and to avoid any unfair surprise that may result when a party who thinks he has met his opponent's case is suddenly confronted at the end of trial with an additional piece of crucial evidence. ■ Thus proper rebuttal evidence does not include a material part of the case in the prosecution's possession that *tends to establish the defendant's commission of the crime*. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt. [Citations.] A defendant's reiterated denial of guilt and the principal facts that purportedly establish it does not justify the prosecution's introduction of new evidence to establish that which defendant would clearly have denied from the start." (*Ibid.*)

Clearly, a purported confession by an accused to any crimes that are charged "tends to establish the defendant's commission of the crime." (See *id.*, at p. 753.) "'If the defendant had confessed, proof of the confession was a part of the case of the People and it was the duty of the

district attorney to offer it before resting his case, when the testimony was then available and there was no reason for not offering it in chief.'" (*People* v. *Robinson* (1960) 179 Cal.App.2d 624, 630 [4 Cal.Rptr. 50].)

In the present case, the prosecutor sought to introduce on cross-examination a limited portion of appellant's confession. The purpose of the evidence was to rebut a statement made by appellant in direct examination which did not cover a matter "implicit in his denial of guilt." On direct examination, appellant admitted knowing Frank Filice and using him on several occasions as a person who was "able to find someone to sell a stolen car to." Appellant stated he did not know that June was Frank's former wife, although he had met her on several occasions, the last time being "the day before or the same day she was shot." Appellant admitted the .357 revolver belonged to him but claimed he never fired it and did not shoot June or Whalen. No testimony was given as to where appellant was at the time of the killing.[32] All of this testimony involved matters implicit in appellant's plea of not guilty.

However, appellant did give further direct testimony about the revolver which he claimed he bought "somewhere around five to seven days" prior to his arrest. This would have been a date *after* the killing of Whalen. Appellant said he bought the gun for $30 from a man whom he believed to be an addict and who was introduced to him by Frank.

At the completion of appellant's direct examination, the prosecutor indicated he wished to examine appellant on that part of his confession which contained statements concerning the revolver. (See *post.*) The trial court agreed.

Although appellant's plea of not guilty notified the prosecution that he would deny possession of the weapon at the time of the crime, it could not be anticipated that appellant would assert he had not even seen the weapon until several days later. Therefore, the prosecutor could cross-examine appellant on that assertion. However, the prosecutor went beyond that and asked appellant if he had told West (1) that he *"left the Filice residence* with the gun and *it was empty"*; (2) that he walked *"from there"* to "someplace" where he hid the gun; (3) that the

---

[32]Appellant's counsel indicated that no alibi testimony was elicited from appellant during direct examination since the trial court had indicated that if such testimony were presented, the confession "would be clearly admissible, no problem whatsoever."

gun was loaded *when he "went into the [Filice] house"*; (4) that he *"left the house"* with this gun and that it was empty *when [he] left the house* and [he] buried it in the bushes some place"; and (5) that he *"used it [the gun] in the shooting."*

In this series of questions, appellant admitted not only possessing the gun at the time of the shootings but committing the shootings as well. The latter admission was tantamount to a confession. ▮▮ Although eliciting this confession went beyond the scope of proper cross-examination, appellant's counsel made no attempt to exclude the extraneous statements. Further, he failed to object to the *form* of the prosecution's questions. This failure by counsel waives any claim of error by appellant.

On redirect examination, appellant testified in front of the jury that he had made the statements regarding the pistol because of "a deal between me and West to get Cheryl released." He noted Patton was released from custody the same day he confessed. Thereafter, the prosecutor engaged in a lengthy reexamination in an attempt to show that appellant's explanation was not truthful. This examination resulted in the introduction into evidence of most of the remainder of appellant's confession. However, any error in this regard was harmless in light of what had been elicited from appellant on cross-examination.

Next, appellant contends that the categories of persons excludable for cause at the guilt phase of a capital trial under *Witherspoon* v. *Illinois* (1968) 391 U.S. 510, 522-523, footnote 21 [20 L.Ed.2d 776, 784-786, 88 S.Ct. 1770], should be narrowed. He argues that persons unalterably opposed to the imposition of the death penalty should be able to serve on a jury at the *guilt phase* if they could be fair and impartial. The Supreme Court in *Witherspoon* did not finally resolve this important issue.[33] However, no prospective juror was excluded for cause at appellant's trial who should have been permitted to serve under appellant's reasoning. Therefore, the issue is not properly before this court.

## V

In view of this court's determination that the evidence was insufficient to support the jury's findings with respect to the special

---

[33]See *Witherspoon, supra,* 391 U.S. at page 520, footnote 18 [20 L.Ed.2d at page 784]; *People v. Sirhan* (1972) 7 Cal.3d 710, 748 [102 Cal.Rptr. 385, 497 P.2d 1121]; *In re Anderson* (1968) 69 Cal.2d 613, 620 [73 Cal.Rptr. 21, 447 P.2d 117].

circumstances allegations, those findings must be set aside, and further proceedings on these allegations are barred by the double jeopardy clause. (*People* v. *Green, supra, ante* at p. 62.) However, this court must also assess whether prejudice resulted as to the remaining charges from the trial court's erroneous admission of the uncharged Breakers robbery. (Cal. Const., art. VI, § 13.)

In the instructions read by the trial judge, the jurors were informed they could consider the evidence of the uncharged robbery on the issue of whether appellant had an intent to steal. As already noted, the circumstances of the charged offenses were ambiguous at best concerning this element, and the fact that the prosecutor brought up the Breakers robbery on at least nine separate occasions during his closing arguments indicates the significance this evidence probably had in the resolution of the question of intent. The prosecutor argued that the Breakers robbery "is important insofar as how it shows the defendant's intent at the time he did the murder[]...." He went on to ask the jury to "look at the way that [appellant] did the robbery in San Luis Obispo if anybody has any questions about whether or not he had any intent to steal; because when [*sic*] he did that very similarly to the way he did this....[Y]ou have a very similar kind of occurence there, and it shows you the intent....[E]ssentially the same thing is going on here as went on in San Luis Obispo...."

There can be no doubt, therefore, that the erroneous admission of the uncharged robbery was prejudicial on the issue of appellant's specific intent to steal. Therefore, the judgment cannot stand as to the robbery and burglary convictions. (Cf., *ante*, fns. 5-8 and accompanying text.)

The situation is more complicated with respect to the convictions for murder and attempted murder. The prosecution sought to prove appellant guilty of first degree murder on two theories: (1) the killing was committed with malice aforethought in a willful, deliberate and premediated manner, and (2) the killing was committed in the perpetration of a robbery and/or a burglary. (Cf., *ante*, fn. 7 and accompanying text.) The latter theory involves the specific intent to steal; the former does not. Usually, it would be impossible to determine whether or not some or all of the jurors arrived at their verdicts based on the second theory of culpability. Under those circumstances, the judgment of both of the murder counts would ordinarily have to be reversed because of the prejudicial error with respect to the specific intent to steal.

However, in the present case, the jury found the special circumstances allegations to be true. These findings necessarily imply that the jury unanimously determined, beyond a reasonable doubt, that the shootings were "willful, deliberate, and premeditated." (Former § 190.2, subd. (c)(3).) Therefore, it follows that the jury must also have unanimously agreed that appellant was guilty of first degree murder on a theory which did not involve an intent to steal.[34] In this situation, the murder and attempted murder convictions would normally be affirmed, and appellant makes no contention as to why it might be improper or unwarranted to follow this procedure. Under these circumstances, the judgment as to the murder and attempted murder convictions are affirmed.

## VI

The judgment against appellant is reversed as to the convictions for robbery (counts 3 and 4) and burglary (count 5); on count 1 the two findings of special circumstances are set aside and the judgment is modified to provide a punishment of life imprisonment. In all other respects, the judgment is affirmed.

Tobriner, J., Mosk, J., and Newman, J., concurred.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur with the majority conclusion that the trial court erred in admitting evidence of defendant's subsequent robbery offense for the purpose of establishing his intent to steal during the present offenses. That error requires a retrial of the robbery and burglary offenses, and of the special circumstances findings which were based upon them.

I respectfully dissent, however, from the entirety of that portion of the opinion (part III) which holds that no substantial evidence existed to support the jury's findings with respect to the special circumstances allegations, and which sets those findings aside, precluding further retrial thereof. In my view there was ample evidence to sustain findings that defendant committed his murder during the commission, *or attempted commission*, of both a robbery and burglary. Accordingly, in fairness, the People should be permitted to reestablish those findings in

---

[34]During closing argument, defense counsel in effect conceded to the jury that the killer acted with malice aforethought.

the course of a retrial which is limited to the issue of defendant's intent to steal.

The majority acknowledges (*ante*, pp. 322-323) that our present review of the record must be made "in the light *most favorable* to the judgment below...." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738], italics added.) Yet the majority, contrary to the foregoing rule, has proceeded to isolate only those portions of the record which would negate the special circumstances findings, disregarding entirely the contrary evidence which supports the jury's findings. Thus, while the majority enunciates the correct standard for review it refuses to apply it.

The majority agrees that "it is at most *a close question* whether the perpetrator [i.e., defendant herein] had any intent to steal at all." (*Ante*, p. 323, italics added.) If so, all such "close questions" must be resolved to *support* the judgment. Within the context of "special circumstances" the statutory requirement of proof of a murder is that it be committed "during the commission *or attempted commission*" of a robbery or burglary (former Pen. Code, § 190.2, subd. (c)(3)(i), (v), italics added). The record contains substantial evidence supporting the jury's findings that defendant murdered the victim while under such special circumstances.

First, as soon as defendant confronted his victims at their residence, he pointed a gun at them and demanded money. Although he refused the few crumpled bills displayed by victim Whalen, the $5 supposedly in victim Filice's purse, and the ring worn by her, the jury might well have found that defendant was seeking a larger cash hoard which he believed was hidden on the premises. Such a finding would be supported by (1) defendant's explanation to Filice that he selected her house because he was told "it would be a good hit," and (2) defendant's subsequent repeated demand for money from his victims.

In addition to demanding money, defendant ordered Whalen to produce his car keys, which defendant took and removed from the key ring. Although defendant did not take Whalen's car, the jury might well have found that he was inhibited only by the fact that, as Whalen subsequently told him, the car bore personalized plates and could readily be identified. Defendant's original intent to steal Whalen's car is further substantiated by repeated record reference to his involvement

with car thefts. The majority itself characterizes defendant as an "accomplished automobile thief." (*Ante*, p. 324.) Indeed, defendant was arrested after negotiating with an undercover officer for the sale of a stolen car. Moreover, his alibi was that he had gone to Long Beach to steal yet another car.

The majority suggests that defendant's demand for money and car keys may have been a ruse to hide his true intent to kill Filice. In this regard, the majorities rely upon defendant's statement to Filice, "you know why I'm here and you know who sent me." Yet it is just as likely that defendant entertained a joint intent to kill *and* to steal. In any event, there is no sound basis for concluding, as does the majority, that Filice's murder was defendant's "primary" intent, while the attempted robbery and burglary were of "secondary importance." (*Ante*, p. 324.) This is purest speculation and violates, again, the cardinal principle of appellate review that trial records are to be viewed favorably to, and in support of, the conviction. Based upon the substantial evidence above discussed, the jury was entitled to find that defendant's murder of Whalen occurred during the commission, or attempted commission, of a robbery and burglary. Accordingly, any expression contained in *People v. Green* (1980) *ante*, pages 1, 59-61 [164 Cal.Rptr. 1, 609 P.2d 468], is inapplicable to the case before us.

As noted, a murder committed during the course either of the commission or *attempted commission* of a robbery or burglary constitutes "special circumstances." Viewed in a light "most favorable to the judgment below," there was ample evidence that the victim Whalen was killed by defendant during the course of the "attempted commission" of either or both robbery and burglary.

I would affirm the murder and attempted murder convictions, reverse the robbery and burglary convictions and special circumstances findings, and permit a limited retrial of the robbery and burglary charges together with the special circumstances allegations.

Clark, J., and Manuel, J., concurred.

Appellant's petition for a rehearing was denied July 16, 1980.