Filed 10/24/14  P. v. Williams CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>FRANK WILLIAMS,<br><br>    Defendant and Appellant. | B248541<br><br>(Los Angeles County<br>Super. Ct. No. BA389699)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on September 25, 2014, be modified as follows.

1.  On page 2, the first sentence of the second paragraph is replaced with the following sentence:  Defendant contends reversal is required because a gang expert spontaneously testified that defendant had participated in, and gotten away from, an unrelated violent bank robbery in which an accomplice was killed.

2.  On page 10, the first sentence in the first paragraph is replaced with the following sentence:  Smith-Scruggs testified that when he was detained 10 days later, the police planted, then seized, some crack cocaine in his pocket.

3.  On page 21, the third sentence in the first paragraph under subpart c. is replaced with the following sentence:  Even if the question could have been viewed as requiring a more expansive response, the trial court erred by overruling defense counsel's objection moments later once it was clear Washington was responding to the question with highly prejudicial other offense information.

There is no change in the judgment.

Respondent's petition for rehearing is denied.

ROTHSCHILD, P. J.                    CHANEY, J.                    MILLER, J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B248541 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA389699) |
| v. | |
| FRANK WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Stephen A. Marcus, Judge.  Reversed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews, Supervising Deputy Attorney General, and David E. Madeo, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Frank Williams appeals from a judgment entered following a jury trial in which he was convicted of two counts of first degree murder; two counts of willful, deliberate, and premeditated attempted murder; mayhem; and shooting at an occupied motor vehicle, with special circumstance, gang, great bodily injury, and personal firearm-use findings.

Defendant contends reversal is required because a gang expert spontaneously interjected into his testimony an assertion that defendant had participated in, and gotten away with, an unrelated violent bank robbery in which an accomplice was killed. We agree because the testimony was extremely inflammatory, the evidence in the case was very closely balanced, and the court's subsequent direction to disregard the evidence was insufficient to cure the resulting prejudice.

Defendant raises other contentions we either find meritless or do not address because they are mooted by the necessity of reversing the judgment.

## BACKGROUND

On the night of January 31, 2004, siblings Jason and Shulma Ramos were killed, and Jose Alvarado Velasquez and Walter Hernandez were wounded by gunfire. (Unless otherwise specified, all date references pertain to 2004.) At the first trial of defendant and then codefendant Leon Brown, the jury convicted Brown of two counts of special circumstance first degree murder and five other offenses, but could not reach a verdict on any of the six charges against defendant. At defendant's first retrial, the jury convicted him of all charges and found all enhancement allegations true. We reversed that judgment on appeal for prejudicial evidentiary error. (*People v. Williams* (Nov. 8, 2010, B213029) [nonpub. opn.].) The Supreme Court denied the Attorney General's petition for review. Upon remand, the prosecutor refiled the case. Defendant was retried and convicted of all charges, with all enhancement allegations found true.

## 1. The shooting

About 11:00 p.m. on the night of January 31, a group of 12 friends and acquaintances aged 15 to approximately 24 (including the Ramos siblings, Velasquez,

2

Hernandez, Anjanneth Franco, Carla Corrales, Miguel Meza, Cesar Maldonado, and Ruben Sandoval), none of whom were, or appeared to be, gang members, arrived at a mansion at the northwest corner of Arlington Avenue and Adams Boulevard in Los Angeles to attend a party that had been advertised on fliers distributed at several high schools and other locations. The group arrived in three cars and parked along the north side of Adams, in front of an apartment building located just west of the mansion. Most members of the group remained in the cars as Franco and Corrales approached or entered a pedestrian gate in the fence enclosing the grounds of the mansion. The gate was near the southwest corner of the mansion grounds.

Franco testified she spoke to a thin man with shoulder-length braided hair who said he was acting as security for the party. She asked if they could attend the party, and the man said they could. The man was on higher ground within the mansion's grounds, about nine to ten feet away from Franco, and the area was dimly lit. She described the man as tall and indicated his height was about five feet eight inches. Previously she had testified he was five feet nine inches or five feet ten inches tall. She did not see a gun in the man's possession. She identified defendant at trial as the man to whom she had spoken. Franco had identified defendant on prior occasions when she testified, although at the first preliminary hearing in October of 2004 she testified she did not really remember the security guard, but defendant looked "similar." She had also selected defendant's photograph from a photographic array about 11 days after the shooting. Franco could not tell whether defendant had braided hair in the photograph in the photographic array, but when police showed her the array, she said, "The hair is exactly the same."

Franco and Corrales returned to the cars and told members of their group they should go into the party. Most of the group began walking toward the pedestrian gate leading into the mansion grounds.

As the group neared the gate, Brown, who had been standing with another man near a Ford Explorer parked in front of the mansion, approached the group alone. The

3

man with whom Brown had been standing was about the same height as Brown, about six feet tall, but thinner.  Brown drew a small or medium-size chrome semiautomatic handgun and asked the group where they were from and why they were there.  He told them to leave and threatened to shoot them.  Several members of the group told Brown that they were not gang members, everything was okay, and they would leave immediately.

Everyone in the group walked quickly toward their cars.  Brown followed them, approached Meza, pointed the gun at him, and attempted to rob him.  Velasquez testified he was about to get into his car when he saw the robbery attempt, but Hernandez testified Velasquez was already seated and got out of the car, as if to help Meza.  Hernandez testified a man somewhere behind them shouted, "Watch out."  Velasquez also heard the shout, but did not know what was said.  According to Hernandez, Velasquez got back in his car after the shout, but before the shooting commenced.

Maldonado testified he drove away while Brown was attempting to rob Meza, but he looked back and saw (not heard) a man near the Explorer screaming at Brown.  He described the screaming man as African-American, about five feet nine inches to six feet tall, with braided hair.  Maldonado did not identify defendant as that man, but had previously testified the man's braids were similar to defendant's hair.[1]

Brown suddenly turned and ran or walked toward Velasquez's car and began firing at it.  Witnesses testified all of the shots were fired in rapid succession.  Franco saw Brown fire the first three shots, then ducked down.  She estimated the shooting lasted for about 30 seconds.  Velasquez estimated the shooting lasted about 8 to 10 seconds.  Hernandez testified Brown began shooting from a location in front of Velasquez's car, then moved along the length of the car.  When the shooting stopped, Hernandez looked out the back of the car he was in and saw Brown get into the driver's seat of the Explorer

---

[1]  Maldonado had also selected someone other than defendant in a photographic array and said that man's hair was similar to that of the shouting man.

4

and speed away. Hernandez did not see anyone else in the Explorer.

Meza got into Sandoval's car, and Velasquez and Sandoval started their cars and drove away. After several blocks, all three cars pulled over. Velasquez and all three of his passengers had been shot. Jason Ramos, who had been in the backseat on the passenger side of the car, was dead. Shulma Ramos, who had been the front seat passenger, was alive but mortally wounded. Hernandez, who had also been in the backseat, suffered a through-and-through shot to his hand. Velasquez had six gunshot wounds, including several to his legs and one that shattered his jaw.

Neither Franco nor any of the five other members of her group who testified at trial saw anyone other than Brown with a gun or shooting. Franco never saw defendant after the initial encounter when she asked about attending the party, and none of the other five members of her group who testified saw defendant at all.

## 2. The investigation

The police found 31 casings at the crime scene: 27 were nine-millimeter casings, all ejected from a single gun, and 4 were .380-caliber casings, all ejected from a single gun. All of the nine-millimeter casings and one of the .380 casings were on the sidewalk and grass in front of the apartment building. The remaining .380-caliber casings were on the apartment building driveway, which bordered the mansion grounds, on the sidewalk crossing that driveway, and on the curb in front of the steps leading up to the pedestrian gate to the mansion grounds. Three of the four .380-caliber casings were east (toward the mansion) of all the nine-millimeter casings.

Examination of Velasquez's car revealed 30 bullet trajectories, all of which were consistent with shooting from outside the car, on its passenger side or through the back.

The police also recovered 29 bullets and bullet fragments from Velasquez's car, 19 of which were identified as nine-millimeter and one as .380-caliber. They also recovered a bullet from Jason Ramos's clothing. To the extent a determination could be made upon the bullets and fragments recovered from Jason and Shulma Ramos by the coroner, the

5

firearms examiner testified they were nine-millimeter and fired by the same gun that ejected the nine-millimeter casings found in front of the apartment building.

The prosecution's principal firearms examiner testified casings ejected from semiautomatic and automatic guns generally land in proximity to the position from which the gun is fired, but they can land up to 20 feet away, and when they land, they can bounce, roll, or be moved by people. Also, shooting "gangster-style," with the palm down, can affect the travel of casings. The firearms examiner opined the bullet trajectories and casing locations were consistent with the person firing the .380-caliber gun moving from in front of the car along its passenger side toward the back of the car and the person firing the nine-millimeter moving from behind the car along its passenger side toward the front of the car. A Tec-9 was one of about 30 different nine-millimeter guns that could have fired the nine-millimeter cartridges. A magazine that large would be 10 to 12 inches long.

Los Angeles Police Department (LAPD) Officer Cedric Washington heard a police radio broadcast regarding the shootings and arrived at the mansion about 11:15 p.m. on January 31. A number of people, including defendant, remained on the grounds of the mansion, but others were leaving, walking west on the sidewalk on Adams where the casings were located. Washington detained defendant, who made no effort to run from Washington. Defendant was wearing red shoes, blue jeans, a white shirt, and a black jacket. Defendant's hair was in bushy braids. Washington patted down defendant and did not find any weapons. The police found no weapons or discarded clothing at the mansion.

Officers conducted a field showup of about 20 young African-American men at the mansion about an hour after the shooting, but it is unclear whether defendant was in that showup. Franco did not identify anyone in the showup and testified defendant was not one of the people in it. An officer who brought Franco to the showup recognized defendant as someone he saw at the mansion, but he was unsure whether defendant was in the showup.

6

Defendant was arrested on a warrant for driving without a license at a different location early on the morning of February 1, taken to jail, and booked. His booking photograph, depicting his hair and attire, was admitted at trial. Washington testified that the photograph accurately reflected defendant's appearance at the time Washington detained him on January 31. In 2004 defendant was five feet six inches tall and weighed about 135 to 140 pounds. Brown was significantly taller and heavier.

**3.      Recovery of the .380-caliber gun used in the shootings**

Sheriff's Sergeant Russell Wilson testified he and his partner responded to a call of a gang fight in West Hollywood on February 16. They approached four of the participants who had gotten into a vehicle. Wilson saw a handgun under the thigh of one of the passengers, Ezequiel Phillips, and seized it. The gun was a loaded .380-caliber chrome semiautomatic.

Detective Jeff Nolte found out about the gun seized from Phillips in 2008. The firearms examiner tested the gun and found it had ejected the four .380-caliber casings found at the crime scene and fired the bullet that created one of the fragments recovered from Velasquez's car.

Washington testified Phillips was a passenger in a vehicle with defendant when the police arrested defendant on February 26. Officers found a photograph of Brown in the vehicle. Washington had seen defendant and Phillips together 10 or 15 times and had also seen Phillips with Brown. Washington opined Phillips was a Black P. Stones (BPS) gang member.

**4.      Statements implicating defendant**

**a.      Chris Smith-Scruggs**

The only evidence introduced at trial identifying defendant as a participant in the charged crimes was a statement given to police by Chris Smith-Scruggs after he was detained following a traffic stop on the night of February 9. Gang Officer Ryan Hicks stopped a car in which Smith-Scruggs was a backseat passenger. The driver and one passenger were members of the BPS gang. Smith-Scruggs was a member of a different

7

gang, the Rolling 20's. The officers found rock cocaine under the dashboard. All four occupants of the car were taken to the police station and interviewed individually. The driver of the car was interviewed first and admitted owning the cocaine, but Hicks went on to interview all the passengers.

Hicks testified he had heard that both Smith-Scruggs and defendant had been at the January 31 party at the mansion, and he knew defendant was disliked by both other gang members and gang officers. When Hicks interviewed Smith-Scruggs, Hicks said he knew who had committed the homicides but just wanted to confirm it. Hicks said he knew that "Frank" was there. Smith-Scruggs looked around, closed the door to the interview room, and told Hicks that he did not see the shooting, but heard the shots, then moved to a different position where he saw defendant "with his hand extended with a gun in his hand and smoke coming out of the barrel." Hicks called homicide detectives to inform them of Smith-Scruggs's statement. Hicks denied threatening Smith-Scruggs, but admitted he did not tell Smith-Scruggs he was no longer a suspect with respect to the cocaine or that he was free to leave. He did not record his interrogation of Smith-Scruggs because his recorder was broken and he never learned how to use the system built into Southwest station.

Nolte responded to Hicks's call and surreptitiously tape-recorded his ensuing interview with Smith-Scruggs. The tape was played at trial. Smith-Scruggs told Nolte that he arrived at the party at the mansion on January 31 about 9:30 p.m. Soon after he arrived, there was a shooting that he had heard involved 18th Street gang members. No one was hurt and the party resumed. About 45 minutes or an hour later, there was a second shooting and Smith-Scruggs and his girlfriend ran out the back door, then around the house. Smith-Scruggs initially said he saw four people: Nutcase (Leon Brown), Infant Geek,[2] and two other people whose names he did not know. They were moving

---

[2] Nolte testified Infant Geek was Brandon McKell, who was related to Yuseff Sinclair. During arguments, the parties stipulated McKell died in August of 2004.

8

around on the sidewalk near the steps and shooting toward the west. Smith-Scruggs thought they were shooting at a car because of the sound, but bushes blocked him from seeing a car. Then Smith-Scruggs and his girlfriend ran back around the house and went through the back gate after someone rammed a car through it. Nolte asked Smith-Scruggs if there was anyone else shooting, and Smith-Scruggs said, "[T]hat's it. Just really Nutcase and Infant Geek from what I know, but there was two other people that I saw that was standing with them, but I don't know them like that. I don't know their names."

After Nolte again asked who else was shooting, Smith-Scruggs said, "Frank. I seen his little body." Asked to describe Frank's height and build, Smith-Scruggs said Frank was about "[f]ive-five, five-six," with a "frail little body." He told Nolte that Frank was wearing a red and brown button-up shirt, "red baggies," "red Nike Dunks with the red laces up," a gold chain, and braids. He said he had known Frank since about the fifth grade. Smith-Scruggs selected photos of Nutcase and defendant in two six-packs of photographs. Nolte did not have Smith-Scruggs circle or otherwise mark the photographs he selected. Smith-Scruggs said that he had seen defendant's gun earlier that night when defendant held it up in the air and was "jumping up and down." It was an "automatic" handgun with "little holes in the front like where you can turn it on at" or "[w]here the bullets come out." After attempting to both describe defendant's gun and remember the name of the gun, Smith-Scruggs said it "looked like a . . . Tec-9," then mentioned a "Goldeneye" game and "007." Smith-Scruggs stated that Nutcase, Infant Geek, and defendant were all BPS gang members from "the Jungle." Smith-Scruggs had seen defendant and Nutcase together once.

At trial, Smith-Scruggs testified he heard gunshots and dropped to the floor. After the gunshots stopped, everyone, including Smith-Scruggs and his girlfriend, ran out the back door of the house. By that time the shooting was over and Smith-Scruggs did not see anyone with a gun or shooting. They broke through the side gate and left the mansion area. Later that night Smith-Scruggs was questioned by the police, and he told them he did not see anything.

9

When Smith-Scruggs was detained 10 days later, the police planted, then seized, some crack cocaine in his pocket. The police officers threatened to "give [him] . . . time" for that unless he gave them information about what happened at the party at the mansion. An officer also suggested Smith-Scruggs might have been the shooter and they said they could charge him with murder. They also threatened to let it be known he was a "snitch," no matter what he said. Smith-Scruggs was 16 years old, scared, and believed he could be charged with a crime he did not commit. He asked to phone his mother, but the officers ignored his request. He had been at the police station for about four hours before the detectives began talking to him. Until the preliminary hearing, he was unaware the detectives had recorded the interview. The recording did not include his entire conversation with the officers. He made a statement so that they would let him go and not charge him, using information the detectives provided him, things he had heard about the shooting from his associates, and things he simply made up. He did not really know defendant and did not know if he was at the party, but an officer had told him they knew defendant had been one of the shooters and showed him a single photograph of defendant before they had him pick defendant out of a six-pack. He based his description of the gun on one in his Golden Eye video game.

At the original preliminary hearing, Smith-Scruggs marked a diagram of the mansion and its surroundings, showing the locations where he saw defendant, Brown, Infant Geek, and the two unidentified men with guns. Smith-Scruggs thus indicated that defendant, Brown, and Infant Geek were inside the grounds of the mansion and the two unidentified gunmen were on the sidewalk just outside the pedestrian gate. At trial Smith-Scruggs admitted he marked the drawing, but testified everything he said about it was made up.

Smith-Scruggs admitted he had told his probation officer he was afraid to testify in the case and explained that just by showing up in court he risked death. He nonetheless denied fearing he could be killed for testifying.

10

Nolte testified Smith-Scruggs told him Brown was the closest to Arlington (the street east of the mansion) of the several men he saw shooting.

### b.    Yuseff Sinclair

On February 6, the police arrested Yuseff Sinclair for an unidentified parole violation and took him to Southwest station.  At the station, Nolte and Officers Murray and Andre Rainey surreptitiously recorded two interviews with him that were played at trial.  At the start of the first recording, Sinclair used the walkie-talkie function on his phone to contact several people and ask whether defendant was using "the tramp eighty" (.380-caliber) or "the tec" gun at the party.  No one provided any information.  Nolte wanted Sinclair to contact "Kisha," who purportedly had told Sinclair defendant had been one of the shooters, but Sinclair said Kisha had no minutes on her phone.  Sinclair later described where Kisha lived.  He said he knew "the tec" was at the party, but he did not know who had it.  He explained a Tec-9 was useful to protect against attacks from the 18th Street gang, whose members were known to wear bullet-proof vests when on the attack.

In the second interview, Nolte said he knew Sinclair had information about the shooting.  Sinclair was concerned about being killed for being a "snitch," but Nolte told him not to worry about his name being in "paperwork."  Sinclair admitted he was at the party, but said he was inside the mansion, "on the microphone" when the shooting occurred.  He fled out the back door with a woman and jumped over a gate.

Sinclair said he had seen defendant outside, in front of the house, inside the grounds but toward the sidewalk, about 10 minutes before the shooting.  Defendant "grabbed" Sinclair and told him to go inside the house because "Mexicans" were "gonna try to roll through."  Sinclair was unarmed and had been shot on prior occasions, so he went inside.  Sinclair said defendant had a Tec-9.  Sinclair last saw defendant inside the mansion grounds, but near the sidewalk.  Sinclair also saw Brown outside, but near the porch.  They were the only BPS members Sinclair saw outside at that time.  Kisha told

11

Sinclair she saw the shooting. Sinclair did *not* say he saw the shooting or saw defendant shooting.[3]

Sinclair said he thought defendant might have been carrying the Tec-9 to impress people and enhance his reputation because he was a "bitch."[4] Brown, on the other hand, was "respected" because he could beat people. Sinclair denied having a grudge against defendant.

In his testimony at trial Sinclair admitted he had attended the party at the mansion. At that time, he was a BPS gang member and was on parole. He had seen defendant around, but did not know him or know he was a BPS member. Sinclair did not see any gang members at the party. Just before the shooting, he saw defendant near him, dancing with a girl. He did not see defendant or anyone else with a gun, and he did not see the shooting. He left through a back door right after the shooting. He saw Smith-Scruggs moving in the same direction.

Sinclair testified Nolte, Rainey, and Murray gave him the information about defendant and Brown committing the shootings and told him what to say in the February 6 interviews. They forced him to make these statements by threatening to pin robberies and other charges on him and to phone his parole officer and report he had violated his parole. They also said he had been identified as a suspect in the murders. Kisha did not exist; Sinclair made her up to assist in extricating himself. At the end of the interviews, the police released Sinclair.

Sinclair was arrested in August of 2004 on robbery charges. On September 15, the attorney who was then representing defendant conducted a recorded interview with

---

[3] The Attorney General's brief erroneously states Sinclair told the police "he saw [defendant] shoot the Tec-9 and saw Brown shoot a small handgun." The Attorney General also relies upon this misstatement of facts in his argument regarding the issues raised on appeal.

[4] Sinclair explained at trial he meant defendant's status within the BPS gang was low.

12

Sinclair that the defense played at trial. In that interview, the attorney showed Sinclair a transcript of his statements to the police and asked whether his statements were true. Sinclair denied making these statements, and told the attorney Nolte and other officers pressured him to make a statement saying he saw defendant and Brown commit the shooting. The officers threatened to send him back to prison on a parole violation or other cases. He made up information, including the existence of Kisha, and lied to free himself. Sinclair said he actually saw defendant at the party, on the dance floor. Defendant was not hanging around outside and Sinclair did not see defendant with a gun.

Nolte and Rainey testified they did not know the identity of the shooters or the types of guns used at the time of Sinclair's interviews, and did not tell Sinclair what to say or pressure him to implicate defendant or Brown. Defendant was not a suspect until Sinclair mentioned him.

In March of 2004, Rainey saw graffiti indicating Sinclair was a snitch.

**5. Gang evidence**

Washington and Rainey testified as prosecution gang experts regarding the BPS gang, which has one clique in Baldwin Village called the Jungle Stones and another clique located in an area that included the mansion. A different gang, the Rolling 20's, claimed as its territory the neighborhood immediately east of the mansion's location. In 2004, the BPS and Rolling 20's gangs got along with one another. Defendant was an active BPS Jungle Stones member, as was Brown. Washington testified he had seen defendant and Brown together on about 50 occasions. The 18th Street gang was an enemy of both the BPS and the Rolling 20's gangs in 2004.

In early 2004, the primary activities of the BPS gang were robberies, murders, selling narcotics, auto theft, graffiti, and drive-by shootings. At that time, there were about 700 members of the BPS gang. Rainey testified that no gang member wants to be known as a snitch because he or she would, at a minimum, be ostracized and might even be killed. Snitching on a higher-ranking member would result in more severe consequences than snitching on a lower-ranking member, however.

13

In response to the prosecutor's hypothetical question mirroring evidence introduced by the prosecution, and asking Washington to assume, in addition, that one of the two BPS gang members who were shooting was firing "an assault rifle," Washington opined that each of the several crimes committed were committed for the benefit of, at the direction of, or in association with the BPS gang. In part, Washington explained the BPS gang members might have believed the victims were members of the 18th Street gang, but the victims' lack of gang affiliation would not affect how the shooting was viewed by the BPS gang. He further explained gang members back up other members of their own gang, and a failure by the second shooter to join in might result in his fellow gang members jumping him. Such a shooting would also enhance the gang's fearsome reputation in the community, as well as the status of the shooters within their gang.

6. **Defense evidence**

a. **Percipient witnesses and responding officers**

Carla Corrales testified she walked up to the mansion gate with Franco. They were met by two or three tall security guards, roughly five feet nine inches tall, who said the party was good and invited them in. Franco and Corrales returned to the cars and told their companions. The group began walking toward the mansion, but turned around when one member of the group said, "Let's go," and explained he had seen someone with a gun.

Corrales testified she did not see a gun until a man attempted to rob Meza. During that robbery attempt, a tall man stood behind the robber and looked around, as if acting as a lookout. He was not one of the security guards Franco and Corrales had previously talked to. Corrales heard the lookout yell something like, "'Go, go.'" or "'Watch out, go.'" The man with the gun began shooting as he walked toward Velasquez's car. Corrales saw only one person shooting, but she ducked before the shots stopped.

Corrales identified Brown from a photographic array as the shooter, but she did not identify defendant. In court, Corrales testified defendant was not one of the guards or the

14

lookout. Defendant was much shorter than those men. Other than in photographs, she had never seen defendant before.

Jessica Smith testified she was acquainted with defendant and saw him at the mansion party on January 31. They were both in a "V.I.P." room downstairs from the main room where the deejay, dance floor, and most of the crowd were. When people in that room heard the gunfire, some dropped to the floor, but others, including Smith, began to run. Defendant told the people who were running to get down on the floor. After the gunfire ended, people waited for about 30 seconds, then went upstairs. Smith was still in the mansion when police arrived and barred people from leaving. When they let Smith out of the building, she saw defendant kneeling on the ground with his hands on his head.

Orisha Moorehead testified she attended the party at the mansion. She knew who defendant was, and he was not acting as a security guard for the party. The security guards were taller and more muscular than defendant. She did not even see defendant at the party.

At the time of the party, Moorehead was dating Smith-Scruggs, who arrived about an hour before the shootings. He was inebriated, reeked of alcohol and marijuana, and continued to drink and smoke marijuana at the party. When they heard the shots, Moorehead and Smith-Scruggs searched for Moorehead's brother together, then ran out the back of the mansion and along a path leading to the side gate, which had to be broken open, then across Arlington, and to a friend's house. They did not run to the front of the mansion "[b]ecause that's where the gunshots were coming from." Smith-Scruggs was with Moorehead the entire time from the moment shots were fired until they reached the friend's house.

Micshela Windom also attended the party at the mansion. She testified Jarrod Gill and an adult were at the door acting as security. During the party Windom danced and spoke with defendant. She did not see defendant with a gun or see him wave a gun around during the party. Windom was inside the mansion and dropped to the floor when she heard gunshots. She saw defendant lying on the floor in the same room. When she

15

got up, she looked around and saw defendant standing near the deejay in the main room. Windom denied there were two shootings that night.

Joel Nwankwo also attended the party at the mansion and saw defendant dancing with a girl. Nwankwo did not see anyone wave a gun around. Defendant was not acting as security for the party. Nwankwo left the party before the shooting.

Detective Gabriel Barboza testified he responded to the mansion after the shooting and decided to conduct a field showup of 10 to 15 young African-American men detained at the scene. He had other officers put the men on the sidewalk in front of the mansion for viewing by witnesses. He did not record the identity or a description of the men in the showup. Barboza's notes indicated the names of five witnesses who were brought to view the showup, but his notes did not indicate Corrales was one of them.

### b. Expert witnesses

Dr. Kathy Pezdek testified for the defense as an expert on eyewitness memory and identification. Factors affecting the reliability of memory and identifications include lighting, exposure time, the visibility of distinctive facial features, delay between observation and identification, whether the eyewitness and the suspect are of different races or ethnicities, suggestive identification procedures, and the intrusion of post-event information or source-monitoring error. For example, a witness may become familiar with the face of a person by viewing photographic arrays, then confuse that person with the actual perpetrator due to familiarity with the person's face from the photographs. Viewing a defendant in court can also affect a witness identification by causing the witness to assume the defendant must be the perpetrator.

Retired LAPD Sergeant Timothy Williams testified as an expert on police procedures. In response to a hypothetical question, he opined it is important for police officers conducting a field showup to document the identities of potential suspects who are in the showup so that the procedure can serve its purpose of either including or excluding someone as a suspect. It also would be important, in the case of a shooting, to perform gunshot residue tests on potential suspects found at the scene to include or

16

exclude them. Williams further opined it was improper for a police officer interviewing a witness to tell the witness the police knew who committed a crime and provide the witness with the name of such person because the purpose of an interview is to obtain information from the witness, not give the witness information. Witnesses provided with information by an officer will "regurgitate to you what they think you want to hear." Williams testified the interrogation rooms at the Southwest Division station (where Smith-Scruggs and Sinclair were interviewed) were, as of 2003, all equipped with an easy-to-use recording system. The LAPD's homicide policy manual states that interviews should be recorded in their entirety.

Retired Deputy Sheriff and forensic firearms examiner Patricia Fant testified as a defense firearms expert. Viewing photographs of the distribution of the casings, she opined the person firing the nine-millimeter gun was farther west than the person firing the .380-caliber gun. She further opined that casings would be found on the mansion grounds if people were shooting from within those grounds. If people were firing from the southwest corner of the mansion grounds, she opined casings would be found on the driveway between the mansion and the apartment building or on the sidewalk in the same area. Fant testified casings "can go 6, 12 feet depending on the round of ammunition. It has a lot to do with the way the gun's being held; but you expect to find it within the area where the shooter was standing." She opined, "The shots came from the grass area in front of the apartments. That's where the expended cartridge cases are. And they fired into the orange Honda."

7.    **Prosecution rebuttal case**

Retired LAPD firearms examiner Starr Sachs testified as the prosecution's second firearms expert. She could not render an opinion regarding the position of the shooters based on the location of the casings because there were too many variables, including whether people moving through the area had disturbed them, the direction the shooters were firing, and whether the shooters were moving or stationary. If people walking westward displaced the casings, the casings' movement would be mainly west, and

17

possibly a bit north or south. Casings on the sidewalk likely would be displaced more than casings on grass.

## 8. Verdicts and sentencing

The jury convicted defendant of the first degree murder of Jason and Shulma Ramos; the willful, deliberate, and premeditated attempted murder of Jose Velasquez and Walter Hernandez; mayhem; and shooting at an occupied motor vehicle. The jury found multiple-murder and gang-murder special circumstances true. (Pen. Code, § 190.2, subd. (a)(3), (22).)[5] The jury further found all of the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members (§ 186.22, subd. (b)(1)). It also found that, in the commission of every offense, defendant personally and intentionally fired a gun, causing death and great bodily injury; personally and intentionally fired a gun; and personally used a gun (§ 12022.53, subds. (b), (c), and (d)). In addition, the jury found that defendant personally inflicted great bodily injury in the commission of the attempted murder and shooting at an occupied vehicle counts (§ 12022.7, subd. (a)).

For the two murder counts, the court sentenced defendant to consecutive terms of life in prison without possibility of parole, plus 25 years to life (§ 12022.53, subd. (d)). For the two attempted murder counts, the court sentenced defendant to consecutive terms of 15 years to life, plus 25 years to life (§ 12022.53, subd. (d)). The court stayed the terms for the mayhem and shooting at an occupied vehicle convictions.

---

[5] Undesignated statutory references are to the Penal Code.

DISCUSSION

**1.	The gang expert's volunteered testimony about defendant's participation in, and failure to be held accountable for, a bank robbery resulting in a death constituted prejudicial error, notwithstanding the trial court's belated admonition to disregard the testimony.**

**a.	Proceedings in the trial court**

In support of a theory that Sinclair and Smith-Scruggs may have implicated defendant falsely due to enmity, defense counsel asked Washington if he had "knowledge of Frank Williams being hated by all gang members or all BPS gang members?" Washington replied, "Yes. I don't know if he was hated by all, but I know that there was an incident, specifically, a bank robbery that it was believed that Frank Williams was involved in. There was I think T.J.—" Defense counsel objected, saying, "I was just asking if he was hated." The court said, "You asked the question," overruled the objection, and invited Washington to finish his answer. Washington continued: "I believe during that bank robbery, . . . T.J., which is the initials that is on Frank Williams's arm, was killed during that commission of that crime, and Frank Williams was one of the—either one or two people that got away from that actual crime scene and, as a result—" Defense counsel again objected, noting there was no evidence defendant "got away." The court again overruled the objection, and defense counsel asked to approach.

After a discussion with counsel outside the presence of the jury, the court instructed the jury not to consider "the last answer" "for the truth of the matter. You are not to consider whether the discussion given by the officer is true or not because it's, obviously, based on hearsay. He wasn't present. He doesn't know. Someone told him this. [¶] On the other hand, . . . you may consider it as to the basis for the officer's opinion to the question was Frank Williams hated? And that's his apparent basis for thinking that Frank Williams was hated by the other gang members. And so to the extent that that casts light on his credibility and his opinion and the basis for that opinion, you

19

may consider it. But it is not to be considered for the truth of the matter because it's based on hearsay."

Later, after a recess and outside the presence of the jury, the court said it had changed its mind and decided that Washington's answer was "prejudicial" and the court would strike it. The court also said it was "concerned about what the appellate court's going to do with it . . . ."

When the jury returned to the courtroom, the court stated, "Ladies and gentlemen, the benefits and times of having a break is I discuss and think about the case, and I have decided to change my ruling regarding the statements made by this witness on the bank robbery. I have decided to strike it from the record, and I have decided to tell you not to consider it for any purpose in this case; okay? And that's my ruling. And, hopefully, that's my final ruling on the nature. [¶] But I have decided, rather than the limiting instruction I gave you, I am now indicating I am striking it altogether. And that relates to the specific statements the witness made about Mr. Williams being involved in the bank robbery."

Defendant contends the introduction of evidence defendant committed another violent crime was not cured by the court's admonition to the jury and violated due process. We agree and conclude the error was prejudicial, even under the more lenient standard of *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*).

### b. Applicable law

California courts have long recognized the extremely prejudicial effect inherent in evidence of prior offenses. (See, e.g., *People v. Calderon* (1994) 9 Cal.4th 69, 79.) Knowledge of the existence of any prior offense creates a serious danger jurors will draw an impermissible inference of criminal propensity. (*People v. Thompson* (1988) 45 Cal.3d 86, 109.) "The inference of a criminal disposition may not be used to establish any link in the chain of logic connecting the uncharged offense with a material fact. If no theory of relevancy can be established without this pitfall, the evidence of the uncharged offense is simply inadmissible." (*People v. Thompson* (1980) 27 Cal.3d 303, 317.)

Under ordinary circumstances, a jury is presumed to obey a trial court's instruction to disregard particular evidence. (*People v. Hinton* (2006) 37 Cal.4th 839, 864.) In some exceptional cases, however, the nature of the improperly introduced evidence is so prejudicial and so significant to the central disputed issue in the case that the court's admonition to disregard it is insufficient "to overcome the substantial danger of undue prejudice and misleading the jury." (*People v. Allen* (1978) 77 Cal.App.3d 924, 935 (*Allen*).) "The finding of exceptional circumstances depends upon the facts in each case. 'An improper reference to a prior conviction may be grounds for reversal in itself [citations] but is nonprejudicial "in the light of a record which points convincingly to guilt. . . ."'" (*Ibid.*) "The limited value of the admonition is implicitly recognized by the tendency of the courts to give it weight when the evidence of guilt is convincing [citation] and to disregard it when the case is a close one." (*People v. Stinson* (1963) 214 Cal.App.2d 476, 483 (*Stinson*).)

**c.     The trial court erred prejudicially by permitting Washington to testify of defendant's involvement in a bank robbery where someone was killed, and its belated admonition was insufficient to cure the prejudice.**

Defense counsel's question called for a yes or no answer as to whether Washington had knowledge defendant was hated, not Washington's opinion or the basis for such an opinion. Therefore, defense counsel did not need to object immediately. Even if the question could have been viewed as requiring a more expansive response, the trial court erred by overruling defense counsel's objection moments later once it was clear Washington was taking advantage of an opportunity to interject highly prejudicial other offense information. The prejudice to defendant was exacerbated when Washington seized his opportunity to inform the jury T.J. was killed in the bank robbery, whereas defendant got away.

The only real issue is whether the court's admonition cured the harm committed by the irrelevant and improper information Washington provided to the jury. A crucial factor in this analysis is the nature of what Washington told the jury. In essence, he said

21

other gang members hated defendant because T.J. was killed in the bank robbery, but defendant "got away." The jury thus heard not only of a prior crime committed by defendant, but also that it was a major violent crime, bank robbery, that resulted in a death.

This information effectively told the jury defendant was a violent criminal who committed major crimes. This strong propensity inference served to corroborate Smith-Scruggs's recanted statement to police identifying defendant as one of the shooters. This reasonably could have caused some jurors to cast aside their reasonable doubts as to whether defendant was one of the shooters. In addition, Washington's statement that defendant "got away," coupled with defendant's obvious freedom from incarceration at the time of the January 31 party, clearly implied he was not prosecuted or punished for that robbery. This increased the prejudicial effect of the prior crime evidence by creating a risk the jury would want to hold him accountable for the bank robbery, as well. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405.)

We consider the extreme prejudice inherent in Washington's volunteered statement in the context of the closeness of the case. The only evidence tending to show defendant was one of the shooters, as opposed to merely being in the vicinity of the shooting, was Smith-Scruggs's statement he saw defendant shooting a Tec-9. Sinclair's statement he saw defendant in possession of a Tec-9 about 10 minutes before the shooting provided some corroboration for Smith-Scruggs's statement, but did not show defendant fired that gun at the victims. He may have given the gun to someone else, there may have been more than one Tec-9 at the party, or the gun fired at the victims may not have been a Tec-9. In any event, both men recanted their statements at trial and gave plausible explanations as to why they gave information to the police, under intense pressure, which they now contended was false. Hicks even admitted at trial he provided defendant's name to Smith-Scruggs and suggested he was their suspect.

Apart from Smith-Scruggs's explanation as to how police obtained his statement, aspects of his statement are inherently dubious. He purportedly told Hicks he saw

22

defendant shooting, but did not mention anyone else. He first told Nolte he saw four people (Brown, Infant Geek, and two unidentified men) shooting, then expanded the number of shooters to five when pressured about defendant. The ballistics evidence indicated only two guns were used. While it is possible the other shooters fired revolvers, none of the bullet fragments recovered reflected the use of any additional guns. More significant is Smith-Scruggs's account in his statement of how he came to view the shooters. He told the police he and his girlfriend ran out the back of the house, away from danger, when he heard shots, then ran around to the front of the house, towards danger, to achieve a viewpoint from which he could see Brown, defendant, Infant Geek, and the two unidentified shooters firing. The surviving victims and members of their group uniformly testified that all of the shots were fired in rapid succession, without pauses. Franco estimated all of the shots were fired in about 30 seconds, while Velasquez testified the entire shooting lasted only about 8 to 10 seconds. Even using the 30-second estimate, it is at least somewhat implausible Smith-Scruggs was able to react to hearing the shots, exit at the rear of the mansion with his girlfriend, and run around to the front side of the mansion to a position in which he could see three people on the grounds and two people on the sidewalk (which was at a lower elevation) shooting. Using the 8- to 10-second estimate, it is highly, perhaps completely, implausible Smith-Scruggs could have left the back of the mansion upon hearing the shots, run around to the front, and seen the five men still shooting. In addition, Smith-Scruggs's girlfriend, Moorehead, plausibly testified they ran out the back and through a side gate, not to the front "where the gunshots were coming from." Finally, Smith-Scruggs's description of defendant's attire did not match defendant's actual attire at the time Washington detained him on the mansion grounds, and the police found no discarded clothing. Thus, even the prosecution's strongest evidence reasonably could have left jurors with reasonable doubt as to defendant's guilt.

Turning to the remaining evidence, none of the surviving victims or members of their group saw a second shooter, and none except Franco even identified defendant as

23

someone they saw, let alone someone they saw with a gun. Franco's identification of defendant as one of the security guards established nothing more than his presence outside the mansion when Franco and Corrales approached, and was also contradicted by Corrales, Windom, and Nwankwo. Members of the victims' group testified the man or men they saw standing with Brown near the SUV and, later, standing behind Brown or yelling at Brown during the robbery attempt were tall—as tall as six feet in height. Defendant stood only about five feet six inches tall. Moreover, defendant did not flee, but remained at the mansion. If he was actually with Brown and shooting at the victims, why did he not jump in the vehicle with Brown and leave the scene to avoid being implicated in the shooting?

Although the evidence against defendant is substantial enough to avoid a reversal for insufficiency of evidence, it remains "closely balanced" and does not "point[] convincingly to guilt." (*Stinson*, *supra*, 214 Cal.App.2d at p. 482.) The information provided by Washington was "poison that had been injected into the minds of the jurors," and "[t]he mere direction that the testimony should be disregarded was no antidote." (*People v. Bentley* (1955) 131 Cal.App.2d 687, 690, disapproved on another ground in *People v. White* (1958) 50 Cal.2d 428, 431.) We conclude there is a reasonable probability one or more jurors would have maintained a reasonable doubt as to defendant's guilt, and defendant would have obtained a more favorable result had Washington not volunteered such extremely prejudicial information about defendant. (*Watson*, *supra*, 46 Cal.2d at p. 836; *Allen*, *supra*, 77 Cal.App.3d at p. 935.) Accordingly, we once again reverse the judgment.

## 2. The record includes sufficient evidence to support a finding of personal premeditation by defendant.

Defendant contends the evidence of premeditation was insufficient to support his first degree murder convictions because, he argues, "[p]remeditation requires a previously formed decision to kill a *specific person*." Defendant cites *People v. Perez* (2010) 50 Cal.4th 222, 230 (*Perez*), in support of this proposition, and argues he "had no reason to

24

kill Jason or Shulma Ramos, and premeditation cannot be inferred solely from the fact that he did kill them, if he did." We must address this issue notwithstanding reversal of the judgment because a conclusion the evidence was insufficient would bar retrial on first degree murder charges. We conclude there was sufficient evidence to support a finding of premeditation, and defendant's interpretation of *Perez* is flawed.

### a.       Applicable law

In determining the sufficiency of evidence, we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable jury could find guilt beyond a reasonable doubt. (*People v. Tully* (2012) 54 Cal.4th 952, 1006.) Substantial evidence is """"evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."""" (*Ibid*.) We presume the existence of every fact supporting the judgment that the jury reasonably could have deduced from the evidence and make all reasonable inferences that support the judgment. (*People v. Barnes* (1986) 42 Cal.3d 284, 303; *People v. Catlin* (2001) 26 Cal.4th 81, 139.)

Premeditation requires that the act be considered beforehand. (*People v. Mayfield* (1997) 14 Cal.4th 668, 767.) The extent of the reflection, not the length of time, is the true test. (*Ibid.*) This process can occur very rapidly, even after an altercation is under way. (*Ibid*.; *People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Three types of evidence that typically support a finding of premeditation and deliberation are (1) planning activity, (2) a prior relationship with the victim or conduct from which a motive could be inferred, and (3) a manner of killing from which a preconceived plan could be inferred. (*People v. Anderson* (1968) 70 Cal.2d 15, 26–27.) These categories are not prerequisites, but simply guidelines to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations, rather than an unconsidered or rash impulse. (*People v. Young* (2005) 34 Cal.4th 1149, 1183.)

25

### b.     Substantial evidence supports a finding of premeditation

Viewing the record in the light most favorable to the judgment (and accepting the prosecution's theory defendant was the person who fired all of the nine-millimeter shots), substantial evidence supported a finding of defendant's personal premeditation.  As to the first of the *Anderson* categories, planning, evidence showing defendant carried a gun with a high-capacity, loaded magazine demonstrates planning.  As to the second *Anderson* category, conduct from which a motive can be inferred, evidence the BPS gang members, including defendant, were on the alert for an attack by their enemy, the 18th Street gang (which had shot at the mansion earlier in the party) tended to show a motive for the shooting, because Brown and defendant may have believed the victims' group included 18th Street gang members.  Alternatively, the motive could have been to enhance the reputation of the BPS gang for ruthlessness and their own reputations and rank within the gang.  As to the third *Anderson* factor, a method of killing from which a preconceived plan could be inferred, the 27 shots defendant fired at the victims as they sat inside a parked car while defendant walked from behind the car along its side toward its hood constitutes a method of killing reflecting preexisting reflection and weighing of considerations.

Defendant's reliance on *Perez*, *supra*, 50 Cal.4th at page 230, for the proposition premeditation requires a "previously formed decision to kill a *specific person*" is misplaced.  In *Perez*, the defendant fired a single shot at a group of eight people, seven of whom were police officers, from a distance of 60 feet.  Evidence showed Perez believed the people in the group were rival gang members, but nothing indicated he was targeting any particular individual in the group.  One officer was wounded.  Perez was convicted of eight counts of attempted murder and challenged the sufficiency of the evidence to support seven of the counts.  (*Id.* at pp. 224, 229.)

The California Supreme Court held the evidence of Perez's intent to kill was sufficient to support only one count of attempted murder.  (*Perez*, *supra*, 50 Cal.4th at p. 225.)  The court explained, "[I]n order for defendant to be convicted of the *attempted*

26

murder of each of the seven officers and the civilian in the group into which he fired the single shot, the prosecution had to prove he acted with the specific intent to kill each victim. [Citations.] '"[G]uilt of attempted murder must be judged separately as to each alleged victim."' [Citations.] '[T]his is true whether the alleged victim was particularly targeted or randomly chosen.' [Citation.]" (*Id.* at p. 230.) The court continued: "[A] rational trier of fact could find that defendant's act of firing a single bullet at a group of eight persons from a distance of 60 feet established that he acted with intent to kill *someone* in the group he fired upon. '[*A*] *person who intends to kill can be guilty of attempted murder even if the person has no specific target in mind. An indiscriminate would-be killer is just as culpable as one who targets a specific person.*' [Citation.] Indeed, defendant has acknowledged that 'the record supports the conclusion that [he] intended to kill whoever in the crowd was struck by the bullet.'" (*Ibid.*, italics added.)

Moreover, *Perez* dealt with intent to kill, not premeditation. It does not support defendant's contention he had to contemplate killing a specific individual in a group of four people sitting in a car at which defendant fired 27 shots.

27

## DISPOSITION

The judgment is reversed.

NOT TO BE PUBLISHED.


MILLER, J.*

We concur:


ROTHSCHILD, P. J.


CHANEY, J.

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.