Filed 6/16/16  P. v. Taylor CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>BYREESE DIRRELL TAYLOR,<br><br>    Defendant and Appellant. | D067733<br><br><br><br>(Super. Ct. No. SCD256085) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Jennifer B. Truong, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Defendant Byreese Dirrell Taylor appeals from a judgment of conviction entered after a jury found him guilty of attempted voluntary manslaughter and assault with a semi-automatic firearm. Taylor challenges his convictions, asserting two main points of error: (1) that there is insufficient evidence that he harbored the requisite intent to kill to support his conviction for attempted voluntary manslaughter, and (2) that the trial court erred in admitting evidence of a telephone conversation between Taylor and a gang member in which Taylor discussed having been shot at and wanting to retaliate for the shooting.

We conclude that neither contention has merit. We therefore affirm the judgment.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

1.    *Prosecution evidence*

a.    *Evidence about the incident*

At trial, evidence was presented demonstrating that Taylor was a member of the Lincoln Park gang. At the time of the charged incident, he lived with Mark Jenkins, another Lincoln Park member, in an area claimed by a rival gang, the West Coast Crips.

On February 12, 2014, two witnesses called 911 to report a shooting that occurred near Taylor's home. One caller reported seeing Taylor "with the gun pointing it and

2

shooting it in broad daylight."  He also saw Taylor and Jenkins chasing the victim.  The other caller later reported that he heard someone yell "West Coast" during the incident.

Police were able to see some of what had occurred on surveillance videos from a nearby residence and an elementary school.  On the video from the residence, one could see a shirtless black man and a black woman walking westbound toward Taylor's home.  The two started to argue, but continued walking.  The shirtless man turned and started running east, followed by Jenkins and Taylor.  Taylor's right hand was raised and he was holding a gun.  Taylor fired one shot, then leveled the handgun and fired several more shots.

The video from the elementary school showed a woman running east, followed by a man who looked like Jenkins.

At the scene, police found five shell casings.  Four of the casings were found in front of a house a few doors down from Taylor's home.  The fifth was found farther south.

In March 2014, police recovered a semi-automatic handgun from a backpack found in a car driven by Hayley Singer, Taylor's girlfriend.  The backpack also contained a court document with Taylor's name on it.

Taylor was arrested later that day.  The following day, a detective interviewed Taylor about the shooting near his home.  Taylor said that he knew nothing about the shooting, and that he had been in school at that time.  Taylor claimed that he had found the handgun in Cholla View Park about two weeks prior to being arrested.  According to

Taylor, he kept the gun for personal protection, because he had been shot at in the past and was afraid of being attacked again.

Later testing of the gun and the spent shell casings found at the scene of the February 12, 2014 incident indicated that those shells had been fired from Taylor's gun.

        b.     *Gang evidence*

Detective Rudy Castro, a police gang expert, testified that he believed Taylor was an active member of the Lincoln Park gang. Taylor's gang moniker was "Rude Boy." Castro based his opinion on Taylor's contacts with police, his association and conversations with gang members, his use of gang hand signs, and his wearing of gang-related clothing.

Castro explained the importance of respect in gang culture, and the principle that if a gang member is disrespected in some way, he would be expected to retaliate. The failure to retaliate would be perceived as weakness by other gang members.

Castro opined that, given hypothetical facts similar to the facts underlying the incident at issue in this case, the person who committed the charged offenses would have done so for the benefit of, or in association with, a gang. The offenses also would promote, further, or assist criminal conduct by gang members.

Although the victim in this case never came forward, Castro explained that among gang members, there is an unwritten rule that no gang member is to cooperate with law enforcement.

4

c. *Evidence related to a telephone call between Taylor and a gang member regarding a prior drive-by shooting in which Taylor was apparently a victim*

On August 27, 2013, Taylor was apparently the victim of a drive-by shooting in West Coast Crips territory. Taylor did not report the shooting to police. However, he did call Justin Anderson, a Lincoln Park gang member, and discussed the shooting.

Taylor told Anderson what had happened, and said that he wanted to retaliate. Taylor and Anderson talked about who might have done the shooting, and Anderson suggested that it was possible that it might have been a fellow Blood gang member who had mistaken Taylor for a West Coast Crip.

2. *Defense evidence*

Taylor testified in his own defense. According to Taylor, on February 12, 2014, he was relaxing inside his home with a semi-automatic gun in his waistband. The gun contained 10 shell cases. Taylor heard people arguing outside and then heard someone say, "I'm going to kill you." Taylor heard a gunshot and then heard a woman scream.

Taylor went outside and saw his "relative in a perilous position that would have made anybody wonder if they're witnessing the death of their family member." According to Taylor, Jenkins, his relative, was on the ground, and a shirtless man was on top of Jenkins. Taylor thought that the shirtless man had a gun, based on the gunshot Taylor had heard. Taylor ran toward the man. When Taylor got within approximately 30 feet, the man "took off." Taylor testified, "I ran him off, and I negligently discharged a firearm in a way to where no one would be hurt." According to Taylor, he chased the man, and "only discharged the firearm until the danger had passed."

5

Taylor testified that he did not intend to kill the victim, and said that he had not aimed at the victim. He conceded that he shot in the direction of the victim, contending that he "wanted it to seem like [he] was shooting in [the victim's] direction" in order to ensure that the victim ran away.

Taylor testified that he did not hear anyone yell "West Coast" or other gang name. He also said that even if someone had yelled out a gang name, it would not have mattered to him because he was not an "active gang member." He associated with gang members, but photographs of him throwing gang signs were done as a joke, to make fun of family members of his who were in the Lincoln Park gang.

After the shooting, Taylor went to his girlfriend's house. Taylor did not report the incident to police, and he later lied to the police during an interview because he did not think they would believe his account because he is black, he had fired the gun, and he did not know who had fired the initial gunshot that he had heard.

During his testimony at trial, Taylor discussed the telephone conversation he had with Anderson. Taylor testified, "I had got shot at, and I wanted something to be done, but although thinking of the repercussions, I didn't go through with whatever we had said over the phone. I had just went to the gym and worked out the steam that I had inside of me."

Character witnesses testified that Taylor was peaceful, honest, respectful, and compassionate, and said that he did not have a reputation for violence.

6

B.    *Procedural background*

Taylor was charged with one count of attempted murder (Pen. Code,[1] §§ 187, 664; count 1), and one count of assault with a semi-automatic firearm (§ 245, subd. (b); count 2).  As to both counts, the information alleged that Taylor committed the offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)), and that he personally used a firearm in the commission of the offenses (§ 12022.5, subd. (a)).

On January 29, 2015, a jury found Taylor guilty on count 2 as charged, and also found him guilty of attempted voluntary manslaughter, a lesser included offense to the charge in count 1.  The jury found the personal use of a firearm enhancements true, but found not true the allegation that Taylor had committed the offenses for the benefit of a gang.

The trial court sentenced Taylor to an aggregate term of ten years in state prison, which included the middle term of six years on count 2, and an additional middle term of four years for the personal use of a firearm enhancement.  The trial court stayed Taylor's sentence on count 1 and the corresponding enhancement pursuant to section 654.

Taylor filed a timely notice of appeal.

---

[1]    Further statutory references are to the Penal Code unless otherwise indicated.

III.

DISCUSSION

A.    *Sufficient evidence supports the verdict*

Taylor contends that there is insufficient evidence to support his conviction for attempted voluntary manslaughter.  According to Taylor, the evidence cannot support a conclusion that he harbored an intent to kill.

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one.  ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt.  [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.]" '  [Citations.]  [¶]  ' "Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." ' "  (*People v. Smith* (2005) 37 Cal.4th 733, 738-739 (*Smith*).)

The offense of attempted voluntary manslaughter requires the specific intent to kill.  (*People v. Montes* (2003) 112 Cal.App.4th 1543, 1545.)  Because there is rarely

direct evidence of a defendant's state of mind, a defendant's intent may be proven by circumstantial evidence. (*People v. Mincey* (1992) 2 Cal.4th 408, 433.)

" ' The act of firing toward a victim at a close, but not point blank, range "in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill." ' " (*Smith*, *supra*, 37 Cal.4th at p. 741.)[2] The firing of a gun multiple times in the direction of a victim, even from "a distance away," can also constitute sufficient evidence of an intent to kill. (*People v. Ramos* (2011) 193 Cal.App.4th 43, 48 [evidence that defendant fired seven shots toward the victim from "a distance away" as victim ran away was sufficient to support jury's finding of intent to kill].)

In this case, the evidence demonstrated that Taylor shot toward the victim five times as the victim ran away from Taylor and Taylor chased him. While the man was running, Taylor had his right hand raised. He fired one shot, and then leveled the handgun and fired four more shots in the direction of the victim. This set of circumstances is sufficient to support the inference that Taylor intended to kill the victim. The fact that Taylor testified that he did not intend to kill the victim, and that he specifically shot in a manner not intended to hit the victim, does not require us to conclude that there was insufficient evidence to support the jury's finding of an intent to

---

[2] The *Smith* court also commented, " ' "The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does . . . poor marksmanship necessarily establish a less culpable state of mind." ' " (*Smith*, *supra*, 37 Cal.4th at p. 741.)

kill. The jury was free to reject Taylor's self-serving testimony, as it apparently did, and conclude instead that Taylor indeed harbored an intent to kill the victim, based on the video and physical evidence that demonstrated that Taylor shot multiple times at a victim who was running away from him.

B.    *The trial court did not abuse its discretion in admitting in evidence of a recording of Taylor's telephone conversation with a known gang member*

Taylor contends that the trial court's admission of a telephone conversation between him and a known gang member was an abuse of discretion under Evidence Code sections 1101 and 352.

1.    *Additional background*

As part of an unrelated investigation, federal law enforcement officers recorded a telephone conversation between Taylor and Justin Anderson, a Lincoln Park gang member, that occurred on August 27, 2013, approximately six months prior to the charged incident. In the recording, Taylor can be heard telling Anderson that someone tried to shoot him in front of his house. Taylor then told Anderson that he wanted to retaliate for the shooting. Anderson and Taylor discussed which gang might have been responsible for the shooting, and Anderson suggested that the shooter could have been a member of Taylor's own gang, or an ally of his gang, speculating that it was possible that the person had mistaken Taylor for a West Coast Crip gang member because of where he lived. Anderson then said that he had to go, and the conversation ended.

The prosecution sought to admit this conversation both to establish that, despite the defense theory that Taylor had simply been acting in defense of another, Taylor had a

10

motive to commit the charged offense, and also to demonstrate that the offense was gang-related.

Defense counsel objected to the admission of this recording, arguing that the conversation was not relevant to the issues to be decided by the jury. Defense counsel also argued that the facts of the August 27, 2013 shooting were not clear, and that Taylor's comments about his desire to retaliate were unduly inflammatory.

The trial court concluded that the conversation was relevant, and that its probative value outweighed any prejudice that might flow from its admission.

A recording of the telephone conversation between Taylor and Anderson was played for the jury. San Diego Police Officer Juan Cisneros and Sergeant Van Cruz explained some of the gang terminology used by Taylor and Anderson during their conversation.

2.    *Analysis*

    a.    *The trial court did not abuse its discretion under Evidence Code section 1101, subdivision (b)*

Taylor first contends that the telephone conversation should not have been admitted because it was improper evidence of his bad character and was used by the prosecutor to suggest that Taylor had a disposition to commit crime, in violation of Evidence Code section 1101.

As an initial matter, we note that Taylor has forfeited this claim by failing to object on these grounds at trial. (See *People v. Doolin* (2009) 45 Cal.4th 390, 434

11

[failure to object on Evidence Code section 1101, subdivision (b) grounds constitutes forfeiture of contention on review].)

The claim is also without merit. Section 1101, subdivision (a) precludes admission in evidence of a defendant's prior bad acts if the inference sought to be established is that the actor, because of the prior bad acts, had the propensity to commit criminal acts in general, or criminal acts of a particular class. (*People v. Thompson* (1980) 27 Cal.3d 303, 317.) However, Evidence Code section 1101, subdivision (b), allows admission of evidence of a "crime, civil wrong, or other act when relevant to prove some fact (such as motive, . . . [or] intent . . . ) other than [the defendant's] disposition to commit such an act."

Taylor's conversation with Anderson was admitted to show Taylor's motive in shooting at the victim, and as being relevant to the question whether he harbored the requisite intent to kill that was at issue with respect to the attempted murder charge. This was permissible. It is clear that the court may allow the prosecution to introduce a defendant's "bad acts" when they are offered to prove some disputed fact, and not merely the defendant's general bad character or propensity to commit crime. (*People v. Daniels* (1991) 52 Cal.3d 815, 857 (*Daniels*) ["As long as there is a direct relationship between the [bad act] and an element of the charged offense, introduction of that evidence is proper"].)

In *Daniels*, the Supreme Court concluded that a trial court did not err in admitting evidence of the circumstances of a bank robbery that had occurred two years prior to the charged offense, which involved the murders of two police officers. (*Daniels*, *supra*, 52

12

Cal.3d at p. 856.) The evidence admitted at trial regarding the prior bank robbery included the defendant's flight, the police pursuit, and the exchange of gunfire that left the defendant "crippled." (*Ibid.*) The testimony about those circumstances had been admitted "to show motive—that defendant killed the police officers in revenge for his own injuries—and intent to kill." (*Ibid.*) According to the Supreme Court, this was proper under Evidence Code section 1101 because there was "a direct relationship between the police rendering defendant a paraplegic and defendant murdering the officers in retribution." (*Daniels*, at p. 857.)

The discussion of retaliation between Taylor and Anderson in this case was somewhat ambiguous because it was not clear to Taylor who had shot at him, and, thus, against whom he wanted to retaliate. However, the fact that he expressed his desire to retaliate was relevant to a determination of whether Taylor was simply attempting to defend Jenkins, or, rather, whether he intended to kill the victim as a result of a violent gang confrontation. We therefore conclude that the evidence of Taylor's telephone conversation with Anderson was admissible under Evidence Code section 1101.

       b.     *The trial court did not abuse its discretion under section 352*

Taylor also contends that even if the telephone conversation was relevant and admissible under Evidence Code section 1101, the trial court should have excluded evidence of the conversation pursuant to Evidence Code section 352 because it was unduly prejudicial and insufficiently probative of his guilt with respect to the charged offenses.

"A trial court may exclude otherwise relevant evidence when its probative value is substantially outweighed by concerns of undue prejudice, confusion, or consumption of time." (*People v. Scott* (2011) 52 Cal.4th 452, 490 (*Scott*).) " ' "Evidence is not prejudicial, as that term is used in a [Evidence Code] section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant." ' " (*Ibid.*) Thus, evidence may be excluded under Evidence Code section 352 if it " ' " ' "uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues." ' " ' " (*Scott*, at p. 491.) Evidence should be excluded as unduly prejudicial when " ' "it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction." ' " (*Ibid.*)

On appeal, we review the trial court's ruling on the admissibility of evidence for abuse of discretion. (*Scott*, *supra*, 52 Cal.4th at p. 491.) The trial court has broad discretion in determining what evidence is relevant. (*People v. Harris* (2005) 37 Cal.4th 310, 337.)

We conclude that the trial court did not abuse its discretion in determining that the evidence of Taylor's telephone conversation with Anderson was more probative than prejudicial. The conversation was not uniquely inflammatory, and was unlikely to have

14

evoked an emotional bias against Taylor. We therefore reject Taylor's contention that the evidence should have been excluded pursuant to Evidence Code section 352.

        c.     *There was no due process violation resulting from the admission of this evidence*

Having found no state law error, we also reject Taylor's federal constitutional claim that the admission of this evidence constituted a violation of his right to due process.

Application of the ordinary rules of evidence under state law generally do not violate a criminal defendant's federal constitutional rights; trial courts retain the intrinsic power under state law to exercise discretion to control the admission of evidence at trial. (*People v. Lawley* (2002) 27 Cal.4th 102, 155.) "[T]he state has power to regulate the procedures under which its laws are carried out, and a rule of evidence in this regard 'is not subject to proscription under the Due Process Clause unless "it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." ' " (*People v. Fitch* (1997) 55 Cal.App.4th 172, 178-179, quoting *Patterson v. New York* (1977) 432 U.S. 197, 201-202.) The admission of the challenged evidence in this case was permissible under state rules of evidence, and it did not rise to the level of a due process violation.

15

## IV.

## DISPOSITION

The judgment of the trial court is affirmed.


AARON, J.

WE CONCUR:

BENKE, Acting P. J.

McDONALD, J.