Filed 10/8/20  P. v. McNally CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>TERRY EDWARD MCNALLY,<br><br>    Defendant and Appellant. | D074977<br><br><br>(Super. Ct. Nos. SCD275826, SCD276669, SCD277976) |

APPEAL from judgments of the Superior Court of San Diego County, Joseph Brannigan, Laura Parsky, Judges.  Affirmed and remanded for resentencing.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Charles C. Ragland, Scott C. Taylor and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Appellant.

Defendant Terry Edward McNally was convicted in three separate trials of an identity theft charge and two assault charges. He challenges the admission of his ex-girlfriend's testimony as improper rebuttal and raises two sentencing issues. We affirm his conviction, finding no prejudicial error, but remand for resentencing.

FACTUAL AND PROCEDURAL BACKGROUND

In 2018, McNally was the subject of three criminal prosecutions in the superior court from unrelated incidents. He took all his cases to trial and was convicted of obtaining personal identifying information with intent to defraud (Pen. Code, § 530.5, subd. (c)(1)),[1] assault with a deadly weapon (§ 245, subd. (a)(1)), and assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)). He also pled guilty to failure to appear (§ 1320.5) and admitted three prior prison terms. He had two sentencing hearings. In the first, Judge Brannigan imposed a total of 11 years and 8 months (SCD275826 & SCD276669). In the second, Judge Parsky added 2 years to run concurrent with his earlier sentence (SCD277976). McNally was also assessed various fines and fees.

Because it is only necessary to understand the facts surrounding McNally's assault with a deadly weapon conviction, we confine our recitation accordingly and detail facts relevant to his sentencing claims below.

1. *The Assault on William Bogusch*

In the spring of 2018, William Bogusch was living out of his car. He parked in a 72-hour lot where he met other people in similar circumstances, including Lori Reyburn. Reyburn and Bogusch struck up a friendship, driven in part by Reyburn's attempt to find safety in numbers while her boyfriend, McNally, spent time in jail. Reyburn told Bogusch about "Terry" and showed

---

[1] All further statutory references are to the Penal Code.

him a picture on her phone. Over the course of several weeks, Reyburn and Bogusch would get together to cook meals on the hood of Bogusch's car, share methamphetamine, and drink. They were usually joined by others, including Joey Mullins, who came around with Reyburn.

At some point, Reyburn gave Bogusch methamphetamine and asked him to sell it for her. Bogusch would later testify he was uncomfortable with this request. He took the drugs reluctantly and passed them onto someone else he knew from the streets to sell. Bogusch did not know what happened with the meth or any money from a sale. According to Reyburn, Bogusch was a known meth dealer and he simply stole her drugs. This, and Reyburn's suspicion that Bogusch stole certain items out of her car, effectively ended their friendship.

In the early morning hours of April 21, Bogusch was asleep in his Jeep when someone knocked on the window. He opened the door and was attacked by a big man with a knife who said something along the lines of " 'do you know who I am?' " and " '[y]ou stole something from my girl.' " Bogusch fought the attacker and, in blocking the knife, suffered a severe cut across his palm. The assailant ran off afterward, leaving Bogusch to place a distressed call to 911 where he said he was cut by a man named Terry. Although he had never met McNally in person and could not readily identify him from the picture Reyburn showed him, he assumed (from what the man said) that the attacker was Reyburn's boyfriend. Bogusch was taken to the hospital where he received 25 stitches.

McNally had been released from jail on April 20 and met up with Reyburn that same evening. Several weeks later he was charged by the district attorney with assaulting Bogusch with a deadly weapon.

3

2. *Procedural History*

At trial, Bogusch served as the prosecution's primary witness. In addition to the 911 call, which was played for the jury, he identified McNally from a photo lineup and again in court. He was certain that McNally was the man who attacked him.

The defense theory was one of mistaken identity. McNally, who testified on his own behalf, gave a version of the evening's events that implicated Joey Mullins as the assailant. According to McNally, Mullins picked him up in Reyburn's car on April 20. They met Reyburn at a laundromat, and then the three of them went to a Wendy's for dinner. Afterward, they drove to the 72-hour parking lot because Mullins and Reyburn wanted to buy some speed, and Mullins knew someone there who would sell it to them. When they arrived, Mullins and McNally left the car while Reyburn stayed near it. But McNally did not approach the dealer's car—at Mullins' request, he waited at a distance and could not see what Mullins was doing. Then, unexpectedly, Mullins came running back and told McNally to "go," so they both rushed back to the car and left.

In the next day or two, McNally returned to the parking lot because he "wanted to know what the hell [he] was running from." He found Bogusch, who had obvious car issues, and offered his assistance. McNally said he helped Bogusch understand the electrical system and promised to get him

4

new tires. Then they ate together.[2] McNally testified he had never met Bogusch nor heard of him prior to that encounter.

On cross-examination, the prosecutor asked McNally if he had blood on his hands when he returned to Reyburn's car with Mullins. McNally denied having blood on his hands.

After the defense case, the People called Reyburn as a rebuttal witness. She contradicted McNally's story in several significant respects. In particular, she said she previously talked to McNally about Bogusch and told him Bogusch was stealing from her. The missing items from her car apparently belonged to McNally, and when he heard about that and the stolen meth, "he wasn't happy." When he returned on April 20, Bogusch was on McNally's mind. He asked Reyburn, " 'Who is this Bill guy?' " She also testified that when McNally and Mullins returned to the car that night, Mullins arrived first, looking "fidgety," and McNally came afterward, somewhat winded. She saw something on his hand that looked like blood.

DISCUSSION

1.  *Rebuttal Testimony*

Section 1093 governs the orderly presentation of evidence in a criminal trial. Subdivision (c) directs that the People present their case first, followed by any evidence the defendant may offer. After that, subdivision (d) allows

---

2    Bogusch's version of this odd encounter was different. He thought, in retrospect, that he met McNally (but did not realize who he was) the morning *before* McNally attacked him. But since McNally was still in custody that morning, Bogusch's timeline did not make sense. Regardless, Bogusch remembered the man approaching him and asking if he wanted help getting his car towed. According to Bogusch, he declined but gave the guy something to eat. He only put the pieces together afterward when he realized who the man was.

5

both sides an opportunity for rebuttal, subject to the trial court's discretion to allow either side to reopen its principal case.

McNally contends the trial court abused its discretion, committing so-called *Carter* error by allowing the prosecutor to call Reyburn as a rebuttal witness when she should have been called during the People's case-in-chief. In *People v. Carter* (1957) 48 Cal.2d 737, 754, our high court explained that "proper rebuttal evidence does not include a material part of the case in the prosecution's possession that tends to establish the defendant's commission of the crime. It is restricted to evidence made necessary by the defendant's case in the sense that he has introduced new evidence or made assertions that were not implicit in his denial of guilt." *Carter* also clarified that the purpose behind the orderly presentation of evidence is threefold: (1) to avoid confusing the jury by giving information out of order, (2) to prevent one side from dramatizing or highlighting certain evidence of its choosing late in the trial, and (3) to avoid the unfairness that can result from last-minute surprises or the introduction of new, "crucial evidence" in the final hour. (*Id.* at pp. 753–754.) Apart from these general principles, impeachment evidence "may be admitted on rebuttal" to counter specific facts that "the defense has put into dispute." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 68 (*Coffman and Marlow*).) This remains proper even when the evidence could have been included in the prosecution's case-in-chief. (*People v. Case* (2018) 5 Cal.5th 1, 46.)

A trial court's decision to admit rebuttal evidence is discretionary, and "will not be disturbed on appeal in the absence of demonstrated abuse of that discretion." (*People v. Young* (2005) 34 Cal.4th 1149, 1199.) To prevail on a claim of improper rebuttal, the appellant must show both error and resulting prejudice. (*People v. Thompson* (1980) 27 Cal.3d 303, 332 (*Thompson*); *People*

6

*v. Daniels* (1991) 52 Cal.3d 815, 860.)  Regarding the prejudice analysis, McNally urges us to apply the more stringent federal constitutional standard of *Chapman v. California* (1967) 386 U.S. 18, 24.  But harm in this case is properly reviewed under the state standard set out in *People v. Watson* (1956) 46 Cal.2d 818, 836, which asks if it is reasonably probable a defendant would have received a better outcome absent the alleged error.  (See *Daniels, supra,* 52 Cal.3d at p. 860 [finding error, but no prejudice, where it was not reasonably probable that defendant would have obtained a more favorable result absent challenged rebuttal testimony]; *People v. Bunyard* (1988) 45 Cal.3d 1189, 1213 [applying the *Watson* standard to evaluate harm].)

As a threshold matter, defense counsel did not preserve this issue for appeal.  In his brief McNally asserts that he did, pointing to an objection counsel made regarding the *potential* for Reyburn's testimony to stray beyond the scope of proper rebuttal.  The court agreed this was a possibility and noted "we'll see how it goes."  But during Reyburn's actual testimony, counsel failed to object to lines of questioning that elicited answers he now claims were improper.[3]  Although counsel registered his preemptive concern, the court appropriately deferred any ruling until the particular evidence was offered.  Under these circumstances, counsel was obligated to object to any specifics of Reyburn's testimony that went beyond the proper scope of rebuttal.  (See *People v. Carrera* (1989) 49 Cal.3d 291, 323; *Coffman and Marlow, supra,* 34 Cal.4th at pp. 68–69; *Thompson, supra,* 27 Cal.3d at p. 332 [defense counsel's failure to object to cross-examination of defendant that

---

[3]     Counsel made only two objections during the course of Reyburn's testimony. One was to Reyburn's account of a voicemail message she left for Bogusch, based on hearsay.  The other challenged her statement to police officers that Mullins showed McNally where Bogusch was located, based on her lack of foundational knowledge.

went outside the scope of direct, eliciting a confession, waived any claim of error].)

But even if we were to set aside the issue of forfeiture and agree Reyburn's testimony included some case-in-chief material, we would not find that McNally was prejudiced by its admission. This case turned on whether the jury believed Bogusch had identified the right man. By inserting himself as a witness and implicating Mullins, McNally narrowed the possibilities down to himself and just one other person. The jury was thus left to consider if it harbored any reasonable doubt that Bogusch had mixed up the two men. Considering the testimony of Bogusch alone, the misidentification theory was thin.

Bogusch was confident in his identification of McNally. He testified to McNally's "distinctive" look — by which he meant the shape of McNally's mouth and his large build gave him a unique visage. More than once, he noted the shape of McNally's mouth and said he focused on this attribute in his identifications. Bogusch described the man who attacked him as in his 40's, over 250 pounds, and shorter than himself (Bogusch is six feet tall). Conversely, he described Mullins as a "younger guy" he knew from hanging around with Reyburn who was taller than him. When asked on cross-examination if it was true that Mullins fit the general description of the attacker he had given to detectives, Bogusch stated he was "[n]owhere near what I have in my head, what I saw" and that Mullins could not have been the person who attacked him. On redirect, Bogusch clarified what he meant: Mullins was larger than McNally, much younger, and had different facial features.

Most importantly, however, Bogusch insisted he would have easily identified Mullins if the younger man had been his assailant. He saw

8

Mullins around the 72-hour parking lot almost every day for a period of a month or more, and "absolutely" knew Mullins by sight well enough that he would have recognized him. The defense never indicated that Bogusch might have some motive to falsely accuse McNally. The theory was that Bogusch, attacked in the middle of the night, simply confused one large, tall man for another—despite Bogusch's apparent pains to avoid this.[4]

Bogusch's testimony alone was strong evidence that he did not make the mistake on which the defense's version of events hinged. And the jury ultimately found Bogusch credible. Reyburn's testimony added nothing to Bogusch's assessment of how the two men appeared to him, nor did it bolster the strength of the evidence before the jury that Bogusch was capable of telling them apart. Considering the record as a whole, it is not reasonably probable that the jury would have reached a different result absent the court's admission of the parts of Reyburn's testimony that may have strayed outside of proper rebuttal.

2.   *Sentencing Issues*

McNally highlights a change in the law—Senate Bill No. 136 (Senate Bill 136)—which requires that the court strike three enhancements from his sentence. Both of his sentencing hearings occurred in November 2018. At that time under section 667.5, former subdivision (b), the court was entitled to add three one-year enhancements to his sentence for each of his three prior prison terms. Senate Bill 136, which became effective on January 1, 2020, amended section 667.5, subdivision (b) and restricted the enhancement to prior prison terms for sexually violent offenses. (*People v. Lopez* (2019)

---

[4]     Bogusch noted that he was worried he could falsely accuse someone if he was not diligent in his photo identification, and that he was "being careful."

42 Cal.App.5th 337, 340–341.) None of McNally's prior prison terms fit that definition. This court has already determined that the *Estrada* rule applies such that defendants like McNally, whose cases were not yet final on appeal when Senate Bill 136 went into effect, benefit from this ameliorative change in the Penal Code. (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682; *In re Estrada* (1965) 63 Cal.2d 740, 742–748.)

The parties agree up to this point on the legal analysis, but they disagree as to the proper remedy. The People request we remand for resentencing while McNally suggests we simply strike the enhancements. We conclude that remand is appropriate because there are opportunities for the court to exercise its discretion at resentencing. It is further convenient that the last issue McNally raises—a challenge to certain fines and fees based on *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*)—can be resolved at the same hearing.

When appellate review changes the composition of a defendant's sentence, remand is appropriate if there are any opportunities for the trial court to exercise discretion. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) Here, both judges who sentenced McNally imposed middle and lower terms. On remand, the court may reconsider the overall balance of his sentence given that the prior prison enhancements must be stricken. At the same time, it can also address McNally's challenge to various assessed fines and fees based on his alleged inability to pay under *Dueñas, supra,* 30 Cal.App.5th 1157.

## DISPOSITION

The cases are remanded for resentencing consistent with this opinion. Upon resentencing, the clerk of the superior court shall prepare an amended abstract of judgment and forward a certified copy to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


GUERRERO, J.

11